UNITED STATES of America

v.

Eric Wesley VALEN.

Crim. No. 14957.

United States District Court,
M. D. Pennsylvania.

Sept. 21, 1972.

S. John Cottone, U. S. Atty., Laurence M. Kelly, Asst. U. S. Atty., Scranton, Pa., for plaintiff.

David Rudovsky, Kairys & Rudovsky, Philadelphia, Pa., Frank G. Harrison, Rosenn, Jenkins & Greenwald, Wilkes-Barre, Pa., for defendant.

SHERIDAN, Chief Judge.

Eric Wesley Valen, defendant, was indicted for knowingly, intentionally and unlawfully possessing with intent to dispense and distribute about forty-four pounds of marihuana, a controlled substance, in violation of Title 21, U.S.C. § 841(a)(1). Defendant has filed a motion to suppress the marihuana as evidence.

On May 25, 1971, at the Emery Freight Office in Tucson, Arizona, Dennis Thompson, an employee, observed two suitcases addressed from one Elaine Blanck, 432 Speedway, Tucson, Arizona, to Eric Valen, Scranton, Pennsylvania, for pickup at the Scranton Airport, Avoca, Pennsylvania. The suitcases were left with Emery for shipment to the Scranton Airport, and were scheduled to depart on American Airlines Flight No. 138, leaving Tucson at 12:35 P.M. on the same date. Sometime between 11:00 and 11:30 A.M., Thompson became suspicious because he was unable to verify the home address and telephone number of Elaine Blanck and because he detected an odor from the suitcases similar to marihuana. Subsequently, Thompson telephoned the United States Customs office at the Tucson Airport and asked to speak with Special Agent Donald Clements. Clements was in Nogales, Arizona, at the time, and Thompson asked that Clements be informed that there were two suitcases containing marihuana which were to leave the Tucson Airport on American Airlines Flight 138.

At the hearing on the motion Thompson testified that after making the telephone call he opened one of the suitcases and found marihuana. He opened the suitcase solely on behalf of the Emery Air Freight Company and for his own protection as an Emery employee, and not on behalf of any governmental agency. He then delivered the suitcases to the American Airlines air freight office at the airport at around 12:00 o'clock noon for shipment on Flight 138. Thompson did not do anything to detain the shipment of the suitcases on Flight 138.

Thompson had smelled marihuana once before and under similar circumstances. On that occasion Clements paid him approximately $375.00, and told him to communicate with him if his suspicions were aroused again. Clements paid Thompson $100.00 for the information he furnished in this case. Both Thompson and Clements emphasized there was no financial arrangement between them. Thompson did not expect payment, and Clements did not promise payment since this was not his decision but that of his superior in the Customs office.

On May 25, 1971, at around 11:30 A. M., Clements received Thompson's message from the Tucson Customs office. He proceeded from Nogales to the Tuc-

son Airport, and arrived between 12:00 noon and 12:15 P.M. The air freight manager told him that Flight 138 was to depart at 12:35 P.M. and that the bags were to be loaded immediately. Clements went directly to the American Airlines freight terminal where he met Thompson. He asked Thompson how he "tumbled" onto the marihuana, and Thompson replied by "smelling" the suitcases. At this time Thompson did not tell Clements that he had previously opened one of the suitcases and found marihuana.

Clements, also detecting the odor of marihuana, opened the suitcases and discovered the marihuana. This occurred at approximately 12:20 or 12:25 P.M. He then seized the suitcases and notified the Airlines.

Clements testified that from his experience it takes between four to six hours to acquire a search warrant in Tucson during the day. In fact, in the prior similar case in which Thompson was involved, it took six hours to obtain the warrant. Clements released the suitcases to agents of the Bureau of Narcotics at approximately 6:00 P.M. that evening, after which the suitcases were again reopened and the contents reexamined. The suitcases were put on American Airlines Flight 246 which left Tucson around midnight and arrived at the Scranton Airport on May 27, 1971, by way of New York City.

Narcotics agents in Tucson notified agents in Scranton, and a surveillance was set up at the Scranton Airport to await the arrival of the suitcases and their eventual pickup. The suitcases arrived at approximately 10:20 A.M. and shortly thereafter a man, later identified as Valen, claimed the baggage at the Emery Freight office. Valen took the suitcases from the air terminal and proceeded to place them in the trunk of a car parked outside. He drove the automobile several hundred feet when he was stopped by narcotics agents at the airport gate. He was immediately arrested and one of the agents opened both the trunk and the suitcases. The agents did not have an arrest or search warrant.

■■ Clements had cause to search the baggage because of Thompson's message and the odor emanating from the suitcases. When Clements talked to Thompson at the airport there was no mention that one suitcase had been previously searched. In no way then can Clements' search be labeled a "fruit" of Thompson's search. Clements' search was independent of Thompson's search.

The Supreme Court in Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, laid down the rule regarding the admissibility of evidence acquired from an independent source:

" . . . The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, . . . ."

See also Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. In discussion of the meaning of the "fruit of the poisonous tree doctrine," the Court in Wong Sun v. United States, 1962, 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, stated:

" . . . We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). . . ."

In a Third Circuit case the court refused to exclude certain testimony on

the ground it was obtained from an independent source:

"  .   .   .   The [fruit of the poisonous tree] doctrine 'excludes evidence obtained from or as a consequence of lawless official acts, not evidence obtained from an "independent source." '

.   .   .   The information as to Smith's identity was gained from personal observation and did not become unusable merely because the same information was subsequently discovered during the illegal search. .   .   .   Absent any exploitation of the illegality, the testimony of Smith was clearly admissible." United States v. Barrow, 3 Cir. 1966, 363 F. 2d 62, 66.

Whether Thompson acted as an individual or as a government agent is not material because Clements made his search and discovered the marihuana not on account of or through information or leads gained from Thompson's search, but through "independent sources." Clements smelled the marihuana, and Thompson's message was not based on Thompson's subsequent search of the baggage but solely on the odor of marihuana. These were the "independent sources."

Cf.  "The prohibition on the use of illegally obtained evidence extends only to facts which were actually discovered by the illegal search or as a result of 'leads' uncovered by the illegal search. Facts or information developed independently of the unlawful act are admissible. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); United States v. Sheba Bracelets, Inc., 248 F.2d 134 (2 Cir. 1957), cert. den., 355 U.S. 904, 78 S.Ct. 330, 2 L.Ed.2d 259." United States v. Rutheiser, S. D.N.Y.1962, 203 F.Supp. 891, 893.

The principal issue is whether Clements' search was valid. The Government argues that Clements' search was a valid warrantless search and seizure. The contention is based on 19 U.S.C. § 482, which permits "border searches" by Customs agents without a warrant. In the alternative, the Government argues that the warrantless search was reasonable under the Fourth Amendment because there were "exigent circumstances," which under common law principles negate the necessity of a search warrant.

It cannot be disputed that Clements had probable cause to search. He was an experienced Customs official, and familiar with the odor of marihuana. The odor of marihuana was sufficent reason for a search and this, coupled with Thompson's message, provided probable cause for the search.

The problem remains—was there justification for a warrantless search. Tucson is approximately 70 miles from the Mexican border. The Government contends that the search was a "border search" within the meaning of 19 U.S.C. § 482. It argues that the Tucson Airport is a distribution center of marihuana to various points in the United States; that the marihuana having originated in Mexico was brought across the United States—Mexican border and transported 70 miles North to the Tucson Airport for distribution; and therefore the search was a "border search."

It is not necessary to show that government officials personally observed the illegal crossing, or that the search be conducted at or near the border, United States v. Weil, 9 Cir. 1970, 432 F.2d 1320, but there must be a factual basis to suspect that the contraband did cross the border, and that the government officials making the search were aware of this fact. The first time the officials became aware of the marihuana was at the Tucson Airport. There was no indication the marihuana had been illegally transported across the border. Under the statute it is necessary to have reasonable cause to suspect the merchandise was imported contrary to law. In this case there is no basis for such a suspicion. The fact the marihuana was discovered at the airport 70 miles from the Mexican border does not in itself give rise to the presumption or even an inference that the marihuana was illegally imported from Mexico. It

cannot be presumed that the marihuana was manufactured and processed in Mexico vis-a-vis the United States. There must be reasonable cause to suspect an illegal importation. This is inherent in the meaning of a "border search."

". . . Where, however, a search for contraband by Customs officers is not made at or in the immediate vicinity of the point of international border crossing, the legality of the search must be tested by a determination whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with *reasonable certainty* that any contraband which might be found in or on the vehicle *at the time of search was aboard the vehicle at the time of entry into the jurisdiction of the United States.* Any search by Customs officials which meets this test is properly called a 'border search'. . . ." Alexander v. United States, 9 Cir. 1966, 362 F.2d 379, 382. (Emphasis supplied.)

Several cases have permitted a "border search" miles from the border itself, but only when there has been a surveillance from the time of crossing.[1] This assures with reasonable certainty that whatever was in the vehicle when it was searched was also in it when it crossed the border. "Here, while there was not a complete surveillance, and while Weil was not seen crossing the border with the suitcases, the surveillance was such as to make it reasonably certain that that is what he did." United States v. Weil, 9 Cir. 1970, 432 F.2d 1320, 1323.

This is not a case in which an informer has supplied the reasonable certainty that there has, is or will be an illegal importation;[2] nor is it a case of international mail;[3] nor is the contraband itself unique to a foreign country, and the importation without more illegal.[4] Rather, our case is similar to those in which because of the distance from the border, and the lack of reasonable suspicion of an illegal importation, the courts have refused to uphold a border search.[5]

■ The Government's other contention is that the search was a reasonable warrantless search under the Fourth Amendment because of the "exigent circumstances," together with the existence of probable cause.

"Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' . . ." Coolidge v. New Hampshire, 1970, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564. (Footnotes omitted.)

The Government has not met this burden. It is true that under the circumstances a search warrant could not have been obtained at the airport. However, Clements could have notified government officials at either New York or Scranton

1. See Rodriguez-Gonzalez v. United States, 9 Cir. 1967, 378 F.2d 256; Plazola v. United States, 9 Cir. 1961, 291 F.2d 56; Alexander v. United States, 9 Cir. 1966, 362 F.2d 379.

2. Alexander v. United States, supra; Rodriguez-Gonzalez v. United States, supra; Stassi v. United States, 5 Cir. 1969, 410 F.2d 946.

3. United States v. Beckley, 6 Cir. 1964, 335 F.2d 86.

4. United States v. Epstein, S.D.N.Y.1965, 240 F.Supp. 84.

5. Valenzuela-Garcia v. United States, 9 Cir. 1970, 425 F.2d 1170; Contreras v. United States, 9 Cir. 1961, 291 F.2d 63.

and a warrant obtained and the suitcases searched at either of these locations.

From the time Clements arrived at the American Airlines Air Freight terminal until the baggage arrived at the Scranton Airport, the suitcases were in effect under the control of government officials. The baggage had been transported from the Emery office to the airport by Thompson, the only Emery employee in the Tucson area. When Clements first came in contact with the suitcases they were being prepared for loading on the 138 flight which was to leave in just a few minutes. Presuming the shipper of the suitcases had a right to reclaim the baggage before flight, the suitcases were to be loaded on a plane which was to depart in a few minutes and Thompson who would have been able to assist the reclaimant was at the air freight terminal, and not at the Emery office. Even granting the presumption of the right and the possibility of a reclamation, Clements was present to prevent it. Once the plane departed, government agents at New York or Scranton had ample time to obtain a warrant before the suitcases arrived at Scranton nearly two days later.

This is not a case as suggested by the Government in which a later search may be impossible. See Carroll v. United States, 1924, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543; Chambers v. Maroney, 1969, 399 U.S. 42, 90 S.Ct. 1975, 26 L. Ed.2d 419, where warrantless searches of fleeing automobiles are involved. Here, government agents knew the exact route and destination of the suitcases. Control of the baggage was in Emery and in effect in government officials, and not in the shipper or Valen.

This is not a Romero v. United States [6] situation in which the passenger waiting for a train could reclaim his baggage before the Customs agent had the opportunity to obtain a search warrant. At the time Clements came upon the scene there was virtually no possibility of a reclamation until after the suitcases arrived at Scranton and were picked up by Valen. Unlike Romero, the baggage was transported by an independent shipper and not by a passenger in flight who could escape with the contraband. In addition, of controlling importance in Romero was the applicability of 19 U.S.C. § 482; here, there is no such applicability.[7]

Hernandez v. United States, 9 Cir. 1965, 353 F.2d 624, is not controlling. Hernandez involved searches by state police officials before passengers carrying marihuana left the state's jurisdiction. An immediate search was necessary before flight so a lawful arrest could be made by state officers while the defendant remained in the state and where they had jurisdiction to make arrest.[8] In our case federal officials were involved and there was nationwide jurisdiction to search and arrest. Also, Valen was not present at the Tucson Airport, so it was not "exigent" that a search and arrest be made before the defendant with the contraband took flight. The arrest of Valen could only have been made at the time he actually claimed the suitcases, and not before. A lawful search with a warrant could easily have been made prior to this time.

The Government relies on Gold v. United States, 9 Cir. 1967, 378 F.2d 588, in distinguishing prior case authority, especially Corngold v. United States, 9

---

6. 5 Cir. 1963, 318 F.2d 530. See United States v. Small, D.Mass.1969, 297 F. Supp. 582, where the court held "exigent circumstances" were not present to permit a warrantless search since the government and locker company alone had control over the contraband.

7. See p. 532; United States v. Epstein, S.D.N.Y.1965, 240 F.Supp. 84, cannot be used as authority for a common law warrantless search. The basis for such a search was founded on 19 U.S.C. § 482, and not on "exigent circumstances" principles. See also United States v. Barsaloux, 5 Cir. 1970, 419 F.2d 1299.

8. See Corngold v. United States, 9 Cir. 1966, 367 F.2d 1, 3, n. 1.

Cir. 1966, 367 F.2d 1. In Corngold, the court went on to say:

> "The officers had no warrant, and there were no circumstances which might have justified a search without one. No arrest was made to which a search without a warrant might be incident. The government made no showing that the packages might be removed before a warrant could be obtained. Appellant was not threatening to remove them, nor was the airline, except under such conditions as the officers saw fit to impose. From the time appellant left the packages with the carrier in Los Angeles they were subject to the effective control of the customs agents. *There was nothing to prevent the agents from securing a warrant on a proper showing,* either before the packages were shipped from Los Angeles *or after they arrived in New York.* On this record, search without a warrant was not justified even if the customs agents had probable cause to believe the packages contained contraband. . . ." P. 3. (Emphasis supplied.) (Footnote omitted.)

Gold, however, involved a search by an airlines employee, not a government agent, and a subsequent search by government officers on information gained from this prior search. The court held the government search valid, not on any "exigent circumstance" principle, but because the private search was legal.[9]

The Government has not shown why it would have been unreasonable for Clements to telephone ahead so a fellow agent could have obtained a proper warrant. The fact Clements had probable cause to search did not give him the right to do so absent any "exigent circumstances." Corngold v. United States, supra; Chapman v. United States, 1961, 365 U.S. 610, 613–616, 81 S.Ct. 776, 5 L.Ed.2d 828.

Dicta in United States v. Van Leeuwen, 1969, 397 U.S. 249, 253, 90 S.Ct. 1029, 25 L.Ed.2d 282, is suggested as a basis for the unreasonableness of telephoning ahead to secure a warrant and thus, the propriety of a warrantless search. Van Leeuwen involved a search with a warrant. Since postal officials had authority to detain certain mail sought to be searched, the Court stated it would be more prudent to detain the mail until the search warrant was obtained than to locate the mail enroute. The facts are quite different from our situation, where there was a warrantless search, and limited detention is not an issue. The Court did not say that enlisting the help of distant federal officials was "unreasonable," but rather that it would not be "prudent" under the circumstances where merely a slight detention would enable government officers to acquire a warrant. Finally, undoubtedly because of the volume of mail and the various routing possibilities, law enforcement officials would have had a difficult task in keeping mail under surveillance while enroute. It would not have been prudent to let the packages enter the mails until a warrant was acquired. Here, the suitcases were clearly distinguishable as part of Emery Air Freight baggage, and there was not a complicated transportation route or the possibility of an enroute variance. Only when contraband is to be carried on a flight to a foreign country is a warrantless search permissible because of the exigent circumstances of losing all jurisdiction, including federal jurisdiction, once the contraband is transported outside of the country.[10]

Therefore, the search by the Customs official in Tucson was unconstitutional as an unreasonable search and seizure, and the seizure of the marihuana from Valen at the Scranton Airport was the

---

9. See Burdeau v. McDowell, 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048.
   As mentioned, this is not the case here. The "fruit" of the private search was not given to federal officials nor did it form the basis or supply leads which prompted the Government's search.

10. United States v. Marti, E.D.N.Y.1970, 321 F.Supp. 59.

direct result of the unlawful search. Under the well-settled "fruit of the poisonous tree doctrine" of Wong Sun v. United States, supra, the evidence of the marihuana must be suppressed.