**UNITED STATES of America, Plaintiff,**

v.

**Gerald Frank KROLL, Defendant.**

**Crim. A. No. 23897-2.**

United States District Court, W. D. Missouri, W. D.

Dec. 6, 1972.

As Amended Feb. 28, 1973.

Sheryle L. Randol, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

Joseph J. Mulvihill, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER SUPPRESSING ILLEGALLY SEIZED EVIDENCE

COLLINSON, District Judge.

This defendant is charged by information with the possession of a small quantity (less than 10 grams) of amphetamine. The amphetamine was discovered in a warrantless search by a government agent of an attache case which the defendant was carrying as he started to

board a TWA flight at the Kansas City Municipal Airport. The defendant filed a motion to suppress this evidence and also to suppress certain statements made by the defendant after the amphetamine was found in his possession, on the grounds that the search violated his Fourth Amendment rights, and that the statements were the fruits of the illegal search.

The Court held an evidentiary hearing and the parties later filed a stipulation of the facts. The Court finds the facts to be that on July 11, 1972, about 1:00 p. m., the defendant purchased a ticket for TWA Flight #338 to Chicago, Illinois. The ticket seller, through some process which was not fully described, determined that the defendant was a possible hijacker and asked him to produce his driver's license for identification. The number of the driver's license was written on the defendant's ticket, which was notice to the passenger security detail at the boarding gate that the defendant fit the hijacker profile and should be searched.

The defendant then went to Gate 12 and was checked in. He then passed through the magnetometer, which was activated by the metal hinges and lock on the attache case he carried. The TWA security agent directed him to place the attache case on a table and open it for inspection. A United States Marshal was working with the TWA agent and watched the search. The Marshal became suspicious because the defendant did not open the file section in the upper part of the attache case and he stepped up, identified himself as a United States Marshal and directed the defendant to open the file section. In the file section the Marshal could observe part of an ordinary white business envelope approximately 9½ inches x 4 inches. The envelope, in the condition it existed in the attache case, was introduced in evidence and examined by the Court. It was light in weight, had a very small bulge, approximately ¼-inch thick and 2 inches across, at one end of the envelope and was otherwise limp and flat. The Marshal felt that the actions of the defendant were "suspicious" and, therefore, asked the defendant to empty the contents of the envelope into the case. The envelope contained a small plastic bag, which contained the amphetamine, and a partly-consumed marijuana cigarette.

It should probably be noted that this search and seizure and the evidentiary hearing in this case both occurred prior to the much publicized "plastic explosive letters," which have been recently mailed by certain terrorist groups. The Court and counsel in this suit have all read quite carefully everything published describing these plastic explosive letters and it appears obvious that this flat, limp envelope, torn open at one end and folded over, containing the small bulge described, could not have been one of the plastic explosive letters or thought to have been one. It is also obvious from the testimony that this United States Marshal had an intuition (a "built-in radar" that many good law enforcement officials have), based on the defendant's actions and expressions, that the envelope contained some sort of contraband. At the time the Marshal asked the defendant to empty the envelope this Court finds that the Marshal was not searching him for weapons of any kind which could be used to hijack the plane but was searching for contraband, and, of course, his intuition proved correct.

This memorandum is limited solely to the facts of this particular case, namely, the search of this envelope by an officer of the federal government.

## I.

The sole issue for our consideration is whether the search and subsequent seizure were permissible under the Fourth Amendment.[1] In resolving this

---

1. No question has been raised as to whether the inspection of the defendant's attache case was a "search" within the meaning of the Fourth Amendment, nor

issue, "our inquiry is a dual one— whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

The search of the defendant's attache case is a fair example of the airline passenger searches now being conducted on a regular basis in every major airport in the country.[2] It appears, however, that there are no reported cases determining the constitutionality of such searches. To that extent, the circumstances of this case are rather novel in terms of Fourth Amendment law.

The more frequently employed constitutional guidelines are not available in this context. It is abundantly clear, first, that the Warrant Clause of the Fourth Amendment and its requirement of "probable cause" are not involved here. This is not to say, however, that the fundamental notions which underlie both the warrant procedure and the requirement of probable cause are not fully relevant. *See* Terry v. Ohio, *supra,* at 20, 88 S.Ct. 1868. And, secondly, though it is not practicable to secure advance judicial approval of airline passenger searches, neither are there generally, or were there in this instance, "exigent circumstances" excusing the warrant procedure, *e. g.,* Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); People v. Sirhan, 7 Cal.3d 710, 102 Cal.Rptr. 385, 497 P.2d 1121, 1139–1140 (1972). Lastly, though similar in some respects, this was not at its inception the type of "stop and frisk" search discussed in Terry v. Ohio, *supra,* and Sibron v. New York, 392 U.S. 40, 88 S. Ct. 1889, 20 L.Ed.2d 917 (1968). Instead, we face a situation where the exploratory search, so often condemned, is a matter of routine, where any and all passengers seeking to board a commer-

cial airplane may be and have been subjected to a search of their persons and belongings, and where the selection of any particular person for search is based on few, if any, meaningful reasons. Such conduct can survive constitutional inhibition only if it passes muster under the Fourth Amendment's general proscription of unreasonable searches and seizures.

"Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." Camara v. Municipal Court, 387 U.S. 523, 536–537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). We consider first, then, the nature and extent of the governmental interest involved. That interest is unchallenged and unmistakable—safety in air transportation. Ruthless political terrorists, blackmailers and kidnappers, and the criminally insane have recognized, with disasterous results, the vulnerability of an airborne craft. Hundreds of lives, both on the ground and off, and millions of dollars in property can be instantly and utterly destroyed by one pistol shot or one bomb. It would be an exercise in frustration to retell the tale of fear, brutality and death which has unfolded in recent years, with which we are all so familiar, and hopefully to which we shall never become accustomed. The Government and the airlines are striving in many ways to protect the lives and property jeopardized by the contemporary outlaw of the airways. We hold no doubts that the airline passenger search is an indispensable part of this effort.

Against the interest in air transportation safety and the need to search which follows from that interest, we must balance the defendant's right to privacy. We limit our concern here to the search of a passenger's carry-on luggage. The search of a passenger's person is a far greater intrusion upon cherished person-

has the Government suggested that there was probable cause to search or that this was a search by a private party.

**2.** Similar searches are also a matter of routine in every Federal building in the country open to the public.

al security and may require different, if not more delicate, standards than those we apply today. The Court does not deny, however, that a public search of a passenger's belongings in a crowded waiting area may be an embarrassing and, to some, a humiliating experience. Nevertheless, the indignities of such a search will not stand against the potential for terror, death and destruction which, absent a search, could readily be carried aboard any airplane by any passenger.

■■ Our evaluation of the proper balance that must be struck between the passenger's interest in safety and his interest in privacy leads us to conclude that there must be a narrowly drawn authority to permit a search for weapons and explosives for the protection of innocent lives. Accordingly, we hold as a general proposition that an inspection search of an airline passenger's carry-on luggage for the limited purpose of protecting lives and property from weapons and explosives is not unreasonable at its inception. It follows that the initiation of the search of the defendant's attache case was reasonable, though grounded on the sole fact that the defendant sought admission to a commercial airplane with carry-on luggage. *This must not be interpreted, however, as license for the wholesale exploration of a passenger's luggage and its contents.* As we shall see below, the *Camara* Court's balancing test for reasonableness is an on-going process and the greater the invasion of privacy the closer an inspection search approaches the boundary of reasonableness.

Our decision finds support in a number of cases where inspection searches conducted for various security and disciplinary reasons have been held reasonable without a showing of probable cause. Walker v. United States, 404 F. 2d 900, 902 (5th Cir. 1968) (neither a search warrant nor probable cause is required for a border search); United States v. Grisby, 335 F.2d 652, 654–655 (4th Cir. 1964) (search of enlisted man's on-base home by military authorities reasonable for security and discipline reasons); United States v. Crowley, 9 F.2d 927 (M.D.Ga.1922) (search of car and person attempting to pass military picket reasonable to prevent wrongful importation of prohibited articles into U. S. military reservation); Keene v. Rodgers, 316 F.Supp. 217, 220 (D.Me.1970) (search of cadet's car at quasi-military academy reasonable to insure compliance with regulations); United States v. Coles, 302 F.Supp. 99, 101–102 (N.D.Me.1969) (search by administrative officer in job corps center of suitcase of corpsman who had just returned from leave was a reasonable exercise of officer's authority to maintain proper standards of conduct and discipline); Moore v. Student Affairs Committee of Troy State Univ., 284 F.Supp. 725, 729–731 (M.D.Ala.1968) (search of student's dorm room reasonable where necessary in aid of basic responsibility of institution regarding discipline and maintenance of educational atmosphere); United States v. Donato, 269 F.Supp. 921, 923–924 (E.D.Pa.1967) (search of government employee's locker reasonable), aff'd 379 F.2d 288 (3 Cir. 1967); United States v. Greenhead, Inc., 256 F. Supp. 890, 892–893 (N.D.Calif.1966) (search by game wardens reasonable to preserve natural resources). "The general thrust of these cases is that where a search is made to maintain order or discipline, to maintain security or to prevent the entry of forbidden articles into a designated area, then a warrantless search is proper even though probable cause may be negligible or absent." Davis v. Reynolds, 319 F.Supp. 20, 22 (N.D.Fla.1970) (routine search or inspection of vehicles pursuant to Florida regulation permitting wildlife officers to check vehicles for dogs and guns in designated areas reasonable to protect wildlife). In each of these cases there was a governmental interest which was not outweighed by the individual's Fourth Amendment rights. The present case clearly falls within the compass of those decisions.

## II.

Our inquiry does not stop with the conclusion that the initiation of an inspection search of the defendant's attache case was reasonable. A search which is reasonable at its inception may yet violate the Fourth Amendment by virtue of its intolerable intensity and scope. Sibron v. New York, 392 U.S. at 65–66, 88 S.Ct. 1889; Warden v. Hayden, 387 U.S. 294, 310, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (Fortas, J., concurring); Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957); Go-Bart Co. v. United States, 282 U.S. 344, 356–358, 51 S.Ct. 153, 75 L.Ed. 374 (1931).

In order to resolve the scope issue in this case we must decide two questions: (1) whether the search of the defendant's attache case exceeded the scope of an inspection search justified at the outset only by the fact that a passenger seeks to board a commercial airplane with carry-on luggage; and (2) if so, whether there were additional operative facts which justified the expansion of the search.

These questions again implicate the *Camara* Court's balancing test for reasonableness. Application of that test to the scope issue also requires the balancing of the need to search against the passenger's right to privacy.

In deciding that the initiation of the search in this case was reasonable, we found that a generalized need to search is generated by the very fact that a passenger wishes to board an airplane with luggage in which weapons or explosives may be concealed. Only an unlimited search of a passenger's luggage would satisfy that need. When balanced against a passenger's right to privacy, however, we would not hesitate to find an unlimited search to be unreasonable. A generalized need to search will allow only a general search.

The Court concedes the difficulty in defining precisely what constitutes a general search. For our purposes, however, we will say that a general search is an inspection of that which may *reasonably* be deemed to conceal a weapon or explosives. Reasonableness, in this context, is a matter of probabilities. For instance, a shoe box in a suitcase is as likely a container for a handgun as the suitcase itself. On the other hand, a lipstick tube in a woman's purse, though it is certainly possible, is not a likely container for nitroglycerin. In same sense, Marshal Andrews' hunch that the white business envelope contained a knife, or any other weapon for that matter, far exceeded the bounds of probability. Where an inspection of those things which probably could contain a weapon or explosives reveals nothing, the search cannot be expanded to include everything in an attache case that could possibly harbor a weapon or explosives. This is entirely consistent with the proposition that the scope of a search must be reasonably related to the purpose which justified it in the first instance. We must conclude, then, that the search of the envelope in question exceeded the scope of the search permitted and justified by the sole fact that a passenger wishes to board an aircraft with carry-on luggage.

The need to search, however, may be enhanced by additional facts of which the searching officer is aware. That is to say, the generalized need to search can become particularized as additional facts become operative. For instance, if the searching officer finds an unusual device in a suitcase and the passenger cannot give an acceptable explanation for its presence, suspicions are reasonably raised and the need to search farther and more closely is enhanced. In this manner, a greater intrusion into a passenger's privacy is offset by a greater need to search. Simply put, an officer is limited at the initial stage by the probabilities of a situation and reasonable suspicion is required before the search may be expanded.

Since the search of the defendant's envelope was not dictated by the probabilities of the situation, it can be sustained against constitutional inhibi-

tion only by a showing of reasonable suspicion arising from other facts. Marshal Andrews testified that he became suspicious when the defendant held the file section of the attache case closed and when the defendant shifted the position of the case as Andrews approached the table. The Court characterizes the defendant's actions as "furtive gestures or movements" and, in holding that such gestures or movements are an insufficient ground to raise a reasonable suspicion, we adopt the reasoning of the California Supreme Court in People v. Superior Court of Yolo County, 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (1970):

> The theory, of course is that although the officer does not actually *see* any contraband from outside the vehicle, he may reasonably *infer* from the timing and direction of the occupant's movements that the latter is in fact in possession of contraband which he is endeavoring to hide. From the viewpoint of the actor, the theory rests on a sound psychological basis: "It is a natural impulse on confrontation to hide immediately any contraband" (People v. Jiminez (1956) 143 Cal. App.2d 671, 674, 300 P.2d 68, 70). We can posit that sudden efforts at concealment, like flight from the scene of a crime, may well be expressions of consciousness of guilt. On the other hand, the same motion may in fact have an entirely innocuous purpose: "It is recognized that a person's reasons for concealment may run the whole spectrum from the most legitimate motives to the most heinous" (People v. Weitzer (1969) supra, 269 Cal.App.2d 274, 292, 75 Cal.Rptr. 318, 330).

> The difficulty is that from the viewpoint of the *observer*, an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be as-

signed a meaning only in their context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion —consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious.

> It is because of this danger that the law requires more than a mere "furtive gesture" to constitute probable cause to search or to arrest. The United States Supreme Court recently reaffirmed this rule in the case of Sibron v. New York (1968) 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917: "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and *when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime*, they are proper factors to be considered in the decision to make an arrest." (Italics added.) That knowledge, of course, may be derived from the usual twin sources of information and observation; stating the rule for California, the court in People v. Tyler (1961) 193 Cal.App.2d 728, 732, 14 Cal.Rptr. 610, 612, declared: "As it is the information known to the police officers or the suspicious circumstances which turn an ordinary gesture into a furtive one, it is equally clear in this state that in the absence of information or other suspicious circumstances, a furtive gesture alone is not sufficient * * *." 3 Cal.3d at 817–818, 91 Cal.Rptr. at 734–735, 478 P.2d at 454–455. (Footnote omitted.)

Although the California court was concerned with a question of probable cause, we believe that that opinion demonstrates equally well the inherent unreliability of furtive gestures or movements as a basis even for reasonable suspicion. There must be something more concrete. We are unwilling to go

beyond the facts of this case and the examples we have discussed to demonstrate what more is needed for reasonable suspicion. We will note, however, that the decisions dealing with "stop and frisk" questions should provide excellent guidance for future cases. It is enough here that we find no ground for reasonable suspicion in the facts before us.

### III.

The Government has also advanced a consent theory to justify the search in this case. The theory is that the defendant knew he would be subject to a search if he attempted to board the airplane with carry-on luggage and since he did make that attempt, he consented to the search. We find that this does not constitute a consent or waiver in any meaningful sense.

For the reasons stated, it is therefore

Ordered that defendant's motion to suppress the evidence, the physical evidence and the oral admissions made by the defendant after the illegal search, is hereby granted.[3]

---

3. It should be noted that this opinion is based on the present state of the art of miniaturization of dangerous explosive devices, based on all the information possible to secure at this time. It is entirely conceivable that miniaturized explosives of sufficient force to constitute a threat to an aircraft could, in the future, be developed to a degree that may invalidate the principles expressed herein.