**UNITED STATES of America,
Plaintiff,**

v.

**Kenneth Allen WINSTANLEY,
Defendant.**

**Crim. A. No. 72–517.**

United States District Court,
E. D. Louisiana.

April 26, 1973.

Cornelius Heusel, Asst. U. S. Atty., New Orleans, La., for United States.

William Crull, III, New Orleans, La., for defendant.

## ON MOTION TO SUPPRESS

CASSIBRY, District Judge:

### I. FINDINGS OF FACT

1.

At approximately 12:30 P.M. on September 2, 1972, Mr. Harold Hebert, a ticket agent with Delta Air Lines was preparing to board passengers at Gate 35 at New Orleans International Airport for a Delta Air Lines flight bound for Montgomery, Alabama.

2.

At that time he was approached by defendant Kenneth Winstanley who fit what was commonly called the "hijack profile." Mr. Winstanley brought one piece of luggage with him to the gate for pre-flight check-in.

3.

Security procedures then in force [1] required that anyone fitting the hijack profile had to produce proper identification, undergo a magnetometer check, and submit to a search of all carry-on luggage before being permitted to board the aircraft. These procedures were normally undertaken by Delta Air Lines personnel. United States Marshals were constantly on duty at the airport, but conducted these security operations only in exceptional circumstances, as explained in more detail below.

A passenger singled out for special processing due to his resemblance to the "hijack profile" normally was not advised initially of the full scope of the search he had to undergo. Instead each succeeding step was revealed to him if, as, and when he surmounted the previous one. If at any stage a prospective passenger objected to a particular security measure, a marshal was summoned. Only if a "searchee" thereafter remained adamant in his refusal to under-

go a particular step in the process was he informed that while he could not be forced to submit to it, he would be refused permission to board unless he did consent. The options available to a recalcitrant profile subject, in other words, were not made known to him prior to the onset of the security procedure.

4.

The general procedures outlined above were followed in processing Mr. Winstanley. Agent Hebert,[2] pursuant to general regulations, requested Mr. Winstanley to produce identification. He did so, and the identification appeared to be satisfactory. He next informed the defendant of the necessity of submitting to a magnetometer search and a baggage check.

5.

At this point, defendant Winstanley became visibly nervous and upset. He told Agent Hebert that he had to return to the main terminal to get another bag. He picked up the one piece of luggage that he had brought with him originally and walked back down the concourse towards the main terminal.

6.

Agent Hebert by this time had become very suspicious of the defendant. He called over his fellow Delta employee, Mr. Robert Dupuy, Jr., who was to conduct the magnetometer and luggage searches that day, and told him to be sure to examine Mr. Winstanley very carefully when he returned.

7.

Mr. Winstanley returned to the boarding gate shortly thereafter, carrying only the one piece of luggage he had had previously. He submitted to the additional search procedures without objec-

---

1. These security procedures have since been broadened to require a magnetometer search of all boarding passengers and a physical search of any luggage they choose to carry aboard the aircraft with them.

2. Mr. Hebert is a Delta ticket agent, not a law enforcement official.

tion. He successfully passed the magnetometer test, and Mr. Dupuy opened his luggage to conduct a weapons search.

### 8.

A thorough examination of Mr. Winstanley's luggage ensued. Although no weapons were found, Mr. Dupuy could not help but observe a clear plastic "baggie"-like pouch that contained a substance resembling marijuana.

### 9.

Agent Dupuy decided to inform a United States Marshal, Mr. Seybold of his belief that Mr. Winstanley was transporting contraband. Apparently this is a standard practice. Although the Delta employees have received no instructions from the marshals on how to search for drugs, they have as a matter of practical experience accumulated a certain expertise in that regard; and while they are not under direct orders to report such occurrences, as a matter of course they will forward any knowledge respecting drugs gleaned from their weapons searches to a United States Marshal, who in turn will pass that information on to agents of the Bureau of Narcotics and Dangerous Drugs.

### 10.

Although Agent Dupuy attempted to conceal his suspicions regarding the contents of the "baggie" from the defendant and to inform the marshals thereof surreptitiously, Mr. Winstanley apparently realized that he had been uncovered, and made an effort to dispose of the package. He removed it from his suitcase, walked across the concourse to a trash receptacle, and placed it inside. This was done in the plain view of both Agent Hebert and Agent Dupuy.

### 11.

When Marshal Seybold, in the company of another Marshal, arrived on the scene moments later, the defendant was still standing in the vicinity of the trash container. The marshals were informed of the events that had transpired by Agents Hebert and Dupuy, including the defendant's attempt to dispose of the incriminating evidence. The marshals in the company of the two Delta employees then approached Mr. Winstanley, and the marshals began to interrogate the defendant regarding the package.

### 12.

Marshal Seybold retrieved the plastic pouch from the waste container and asked the defendant whether he had thrown anything into that receptacle. Mr. Winstanley replied that the package was not his. At this point Marshal Seybold confronted the defendant with the stories of Agents Dupuy and Hebert associating him with it. Allegedly Mr. Winstanley changed his story, admitted ownership of the contraband, and pleaded for mercy. Only after this admission had been elicited was Mr. Winstanley told that he was under arrest and advised of his *Miranda* rights.

### 13.

From the time the marshals first approached Mr. Winstanley, their investigation had narrowed to the point where he was a suspect—the only suspect—in a potential possessory drug offense case. Based on the information supplied to him by Agents Dupuy and Hebert, Marshal Seybold would have been derelict in his duty had he failed to conduct a thorough investigation of the incident. I find that Marshal Seybold had ample grounds at least to detain the defendant until the contents of the package could be analyzed, and that he intended to do so from the time these facts were first called to his attention.

### 14.

I further find that Marshal Seybold's testimony to the effect that when the marshals initially spoke to the defendant he was free to leave is not credible; and that Mr. Winstanley was in fact under arrest from the very beginning of his conversation with the marshals.

**15.**

Subsequent to his arrest on the concourse, Mr. Winstanley was taken downstairs to an office. A pat-down on the concourse had revealed certain bulges and lumps in the defendant's coat. Although the marshals did not believe these items were weapons, once they got to the office, they thoroughly searched the defendant's person. This search revealed a large number of small bottles and plastic envelopes containing pills that appeared to Marshal Seybold to resemble various narcotic and hallucinogenic drugs. This search was conducted without a warrant.

**16.**

Upon arriving at the office, the defendant was once again apprised of his *Miranda* rights by Marshal Seybold. Mr. Winstanley nevertheless chose to make a statement regarding the alleged offense.

**17.**

The United States Marshals contacted Agent Hanna and Group Supervisor Bush of the Bureau of Narcotics and Dangerous Drugs. Group Supervisor Bush advised the defendant of his constitutional rights at the airport, and showed him a waiver-of-rights form which he did not sign. Mr. Winstanley, however, did not express an unwillingness to talk at this time, and he allegedly told Mr. Bush that he had been transporting the drugs as a courier for an unidentified principal in San Francisco.

**18.**

The drugs confiscated from Mr. Winstanley's person were turned over to these Bureau of Narcotics and Dangerous Drugs agents, and field tests conducted on them at the airport indicated that they were in fact narcotic substances. Mr. Bush made arrangements to have Mr. Winstanley's luggage picked up and forwarded to Bureau headquarters. Thereupon the defendant was removed from the airport and taken to the Bureau for further interrogation.

**19.**

On the way to Bureau headquarters, the defendant recanted his earlier statement in which he had linked himself to this drug shipment. Otherwise, he made no additional confession or admission regarding his involvement with the contraband.

**20.**

At Bureau headquarters the examination of the defendant continued. Mr. Winstanley allegedly admitted that he had purchased the drugs found in his possession. An inventory of the defendant's luggage had revealed what appeared to be a profit-and-loss ledger detailing various drug transactions. Mr. Winstanley was supposedly asked if the handwriting in this book was his and he admitted that it was. At that point he was queried as to whether he had intended to distribute the drugs. Mr. Winstanley then expressed an unwillingness to speak further and requested a lawyer, whereupon all further questioning ceased. None of the alleged statements allegedly given by Mr. Winstanley were reduced to writing.

## II. LEGAL ISSUES PRESENTED BY THIS MOTION

The motion to suppress in this case raises a number of issues for review: (1) the legality of the search of Mr. Winstanley's luggage; (2) the legality of the defendant's arrest; (3) the admissibility of certain inculpatory statements made by the defendant to Marshal Seybold while standing in the concourse; (4) the legality of the subsequent search of Mr. Winstanley's person in the airport office; (5) the admissibility of certain statements made by the defendant in the airport office during the course of his interrogation there.

A. The Legality of the Search of Mr. Winstanley's Luggage.

The validity of the search in this case has presented no small problem for me. Here the defendant was stopped initially only because he met the "hijacker pro-

file." I have been informed just what the profile guidelines are; and while it would not be in the public interest to reveal them here, I can say that they are far too broad to provide probable cause to either arrest or search anyone. Courts which have applied the Fourth Amendment in its full rigor to such searches have consistently struck them down. Thus in United States v. Meulener, D.C., 351 F.Supp. 1284, involving facts very similar to those presented here, the court held that a search of a boarding passenger's luggage had violated the strictures of the Fourth Amendment. There Judge Ferguson explained that:

> [T]he defendant's Fourth Amendment rights were violated when he was not told at the time the search was initiated that he had a right to refuse to submit to the search provided he did not board the airplane. As there was no probable cause for the defendant's arrest at the time he attempted to board, the only factors cited to support the search of his suitcase were that he met the hijacker profile and that the magnetometer registered positive. While the marshal was entitled to insist that the defendant undergo a carefully limited search for weapons or explosives if he attempted to board the airplane, the defendant was entitled to be given the choice of undergoing the search and boarding the airplane, or declining to be searched upon the condition that he not board the airplane. There is no indication that the defendant's behavior was such that the marshal was justified in searching or detaining him if he chose not to board the aircraft.[3]

Very much the same thing could be said of the defendant in this case.

Similarly, those courts who have been willing to acknowledge a relaxation of Fourth Amendment requirements with respect to airport searches, have been careful to confine the search to its legitimating purpose. Thus, for example, in United States v. Kroll, 351 F.Supp. 148 (W.D.Mo.1972) when an overzealous marshal extended his "weapons" search to include an ordinary white business envelope found in a passenger's luggage, the court found that the search was no longer "reasonable." Consequently, illicit drugs found in the envelope had to be suppressed. The court recognized that the government's interest in preventing air piracy made "the search of the defendant's attache case . . . reasonable, though grounded on the sole fact that the defendant sought admission to a commercial airplane with carry-on luggage." 351 F.Supp. at 152. But that did not end Judge Collinson's inquiry, since he realized that "[a] search which is reasonable at its inception may yet violate the Fourth Amendment by virtue of its intolerable intensity and scope." 351 F.Supp. at 153. Cf. Sibron v. New York, 392 U.S. 40, 65–66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). In the case before him the Judge found that:

> [The Marshal's] hunch that the white business envelope contained a knife, or any other weapon for that matter, far exceeded the bounds of probability. Where an inspection of those things which probaby could contain a weapon or explosives reveals nothing, the search cannot be expanded to include everything in an attache case that could possibly harbor a weapon or explosives. This is entirely consistent with the proposition that the scope of a search must be reasonably related to the purpose which justified it in the first instance.

351 F.Supp. at 153.

■■ While I am in agreement with these decisions, they do not resolve the problems presented to me by this case, which are three in number. First, the search here, unlike that in Kroll, supra, did not pass beyond the limits of a reasonably thorough search for weapons. The offending transparent container was in plain view, as, of course, were its contents. Hence the search here did not

---

3. 351 F.Supp. at 1286.

become violative of the Fourth Amendment "by virtue of its intolerable intensity and scope," *Kroll, supra*; and the mere fact that the agent's search was ostensibly for weapons does not require the exclusion of other articles of contraband unearthed incident thereto so long as the search itself was reasonable. United States v. Moreno, 475 F.2d 44 (5th Cir. 1973); United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971). *Cf.* United States v. Saunders, No. 72–2737, 476 F.2d 5 (5th Cir. 1973).

 A second problem present in this case is that the allegedly offensive search was conducted by a Delta Air Lines employee and not by a marshal as was the case in *Kroll* and *Meulener*, both *supra*. It is hornbook law that a person is not secured by the Fourth Amendment against unreasonable searches and seizures conducted by private parties, unless those parties are operating in the service of some governmental investigation. United States v. West, 453 F.2d 1351 (3d Cir. 1972); Duran v. United States, 413 F.2d 596 (9th Cir. 1969), cert. denied, 396 U.S. 917, 90 S.Ct. 239, 24 L.Ed.2d 195; United States v. McGuire, 381 F.2d 306 (2d Cir. 1967), cert. denied, 389 U.S. 1053, 88 S.Ct. 800, 801, 19 L.Ed.2d 848; Barnes v. United States, 373 F.2d 517 (5th Cir. 1967). Consequently, even if I were to find the search at issue here to be unreasonable, it would not be violative of the defendant's Fourth Amendment right unless the activities of Delta's employees were sufficiently infused with governmental authority and responsibility as to withdraw their conduct from the private realm. *See* United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971).

 A third feature of this suit distinguishing it from *Kroll* and *Meulener* is that the defendant here appears to have consented to the search in question.

All parties to this litigation are agreed that such consent is not readily inferred, since it amounts to a waiver of a constitutional right, and:

> "Waiver, in this context, means the 'intentional relinquishment of a known right or privilege.' Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Such a waiver cannot be conclusively presumed from a verbal expression of assent. The court must determine from all the circumstances whether the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the office[r] a license which the person knows may be freely and effectively withheld."

Cipres v. United States, 343 F.2d 95, 97 (9th Cir. 1965). Thus to meet constitutional requirements,

> "the consent must be proved, by clear and positive evidence, to be voluntary, unequivocal, specific and intelligently given rather than resulting from duress or coercion, whether actual or implied. United States v. Como, 340 F.2d 891, 893 (2d Cir. 1965); United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962), cert. denied, 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963)."

United States v. Bell, 335 F.Supp. 797, 803 (E.D.N.Y.1971). United States v. Jones, 475 F.2d 723 (5th Cir., 1973); *See also* 8A J. Moore, Federal Practice ¶ 41.07[4], at 41–79. Further, the government bears the burden of proof that consent was free and voluntary. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

 Judged by such guidelines, I find that the defendant here did consent to the search in question.[4] Utilizing only the testimony of the defendant himself, the pertinent portions of which are

---

4. I thus pretermit any consideration of whether the Delta employees' search of Mr. Winstanley's luggage was one governed by Fourth Amendment limitations, although I assume it was for purposes of the ensuing discussion. *See also* United States v. Lopez, 328 F.Supp. 1077 (E.D. N.Y.1971) (holding that airline employee conducting search was government agent for Fourth Amendment purposes).

set out in the margin,[5] it is clear that Mr. Winstanley knew that his luggage would have to be searched if he wanted to board the aircraft, but that he was free to avoid this search if he were willing to forego passage. The defendant believed—and was in fact correct in so believing—that he could leave the airport without being stopped or searched. Unlike the defendant in *Meulener, supra*, Mr. Winstanley was free to—and did— leave the boarding area *with his baggage* prior to being searched, and he returned to the gate of his own free will, knowing that he would have to have his luggage inspected in order to board the aircraft. Simply put, the defendant decided to brazen it out, and his efforts having proven unsuccessful, he cannot now be heard to say that the Fourth Amendment saves him from his own folly.[6]

5. BY MR. HEUSEL [Assistant United States Attorney]:
Q. Mr. Winstanley, isn't it a fact that *you left the gate and proceeded back* in to the concourse somewhere, and then later came back to the search?
A. Yes, sir.
Q. You left the scene after being told that you would not be allowed on board unless you were previously searched, is that correct?
A. They said there was no one there to search me right then.
Q. But, you left the scene, is that right?
A. Yes, sir.
Q. Nobody followed you, no one had you in custody, no one had you in handcuffs, is that correct?
A. Yes, sir.
Q. You could have walked out of the airport?
A. Yes, sir.
Q. You had your bags on your person, in your hands?
A. Yes, sir.
Q. Where did you go after you left the gate?
A. I went down to the main terminal part.
Q. Down to the main terminal is about how far?
A. The center of the airport.
Q. And did you enter a rest room?
A. Did I enter the restroom? Yes, I did.
Q. At no time were you ever in the custody of any Delta employee or any United States Marshal, is that correct?
A. Yes, sir.
Q. To your knowledge, was there anything to prevent you from walking out of the airport?
A. No, sir.
Q. Did you go back to the gate of your own free will?
A. Yes.
Q. Did anyone force you to go back to the gate?
A. No, sir.

Q. You went back to that gate knowing full well that you would be subject to a search?
A. Yes.
Q. And, you consented to go back there and have the search performed?
A. They said I would be searched.
BY THE COURT:
They said what?
A. Well, they said I had to be searched before I would be allowed to board the airplane.
BY MR. HEUSEL:
Q. You were not told that you had to be searched, you were only told that you could not enter the aircraft without being searched?
A. To get to Montgomery, I would have to be searched.
Q. To what?
A. To catch the airplane to Montgomery, right.
Q. So, you knew that you could not enter the aircraft without prior being searched?
A. Right.
Q. But, no one told you that you had to be searched before you could leave the airport?
A. No, sir.
BY MR. HEUSEL:
No further questions.

6. In his well reasoned opinion in *Meulener*, Judge Ferguson, in rejecting the government's argument that the defendant had impliedly consented to the search there, stated that "the government [cannot] condition the defendant's constitutional right to travel on the voluntary relinquishment of his Fourth Amendment rights." 351 F.Supp. at 1288. *See also* United States v. Lopez, 328 F.Supp. 1077, 1092–1093 (E.D.N.Y.1971). Insofar as that language can be read as saying that it is unconstitutional for the government to condition the right of an airline passenger to board an aircraft on his or her agreement to allow a search of his or her carry-on luggage for weapons reasonably limited in scope, I feel con-

Consequently, the search of Mr. Winstanley's luggage must be upheld, and the motion to suppress the marijuana seized as a result of that search must be denied. Since I hold that search to be proper, the motion to suppress statements and other items of evidence subsequently seized must also be rejected to the extent that such a motion is based on a "fruit of the poisonous tree" rationale. *See* Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963). However, there are other objections to these admissions and to the narcotic substances later seized from Mr. Winstanley's person which do not depend on the validity of the initial search of Mr. Winstanley's baggage. It is to those alleged irregularities that I now turn.

**B. The Legality of the Defendant's Arrest.**

The primary objection that the defendant raised to his arrest has been to characterize it as the fruit of an illegal search. For the reasons detailed in part II.A. of this opinion, that argument must be rejected. In addition, however, the defendant asserts that his warrantless arrest is invalid, because the offense that he had arguably committed was only a misdemeanor (possession of marijuana), and Marshal Seybold had no authority to arrest anyone without a warrant for a misdemeanor committed outside of his presence. Hence, the defendant maintains, his arrest on the concourse was a nullity and the search of his person conducted in the airport office subsequent to that arrest was therefore infirm.

However, I do not agree with the defendant's contention that the only possible offense revealed to Marshal Seybold by the conduct known to him was a misdemeanor. Based on the testimony of the two Delta ticket agents and his examination of the plastic container, Marshal Seybold had reasonable grounds to believe that Mr. Winstanley had been in possession of marijuana. But whether this substance was for his own use (a misdemeanor, 21 U.S.C. § 844), or for distribution (a felony, 21 U.S.C. § 841(a), provided that it was not a "small amount of marijuana [to be distributed] for no remuneration," 21 U.S. C. § 841(b)(4)), was a question the marshal had no way of answering. There is no requirement that a law enforcement official decline to arrest a possible felon because of the contingent possibility that a subsequent weighing and sifting of the evidence by prosecutorial authorities will indicate that the offense in question was in reality only a misdemeanor. It is enough that the evidence available to the arresting officer indicated a substantial likelihood that Mr. Winstanley had committed a felony. Such evidence was present here, so that the defendant's arrest must be upheld.

**C. Incriminating Statements Elicited in Concourse.**

The defendant strenuously contends that certain statements that he made to Marshal Seybold while they were standing in the concourse were extracted from him in violation of his Fifth Amendment rights, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Sixth Amendment rights, Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). I agree.

The relevant facts in this regard have been set out in Findings of Fact Nos. 11 to 14, *supra*, and need not be recapitulated here. Suffice it to say that prior to the time the marshal first spoke to Mr. Winstanley he had (1) discovered a packet of a substance appearing to be marijuana and (2) had heard credible eye-witnesses state that they

strained to reject it, in view of square holdings of the Fifth Circuit to the contrary. *See especially*, United States v. Moreno, 475 F.2d 44 (5th Cir., 1973).

*See also*, United States v. Owens, 475 F.2d 759 (5th Cir., 1973); United States v. Mather, 465 F.2d 1035 (5th Cir., 1972).

had seen that packet in the defendant's possession. The questions asked were not exploratory or investigative in nature, *cf.* People v. Morse, 70 Cal.2d 711, 76 Cal.Rptr. 391, 452 P.2d 607 (Cal. 1969). There was no doubt in Marshal Seybold's mind either as to the nature of the crime or as to the identity of the criminal. He was undoubtedly in possession of sufficient information to arrest the defendant from the time he examined the packet, yet he deliberately refrained from formally announcing his intent to do so until after Mr. Winstanley had made his incriminating admissions. In this he went too far. *Miranda* warnings must be given as soon as the investigation has focused on the person being questioned, Windsor v. United States, 389 F.2d 530 (5th Cir. 1968), and the failure to do so here means that any reference to the incriminating statements elicited from the defendant in the concourse will not be permitted in any trial held in this cause.

D. The Legality of the Search of Mr. Winstanley's Person.

 Whether the warrantless search of Mr. Winstanley's person in the airport office was permissible is governed by constitutional principles set forth by the Supreme Court in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969). There the Court limited the scope of searches that could be conducted validly incident to a lawful arrest, and said:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. * * * In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

Id. at 762–763, 89 S.Ct. at 2040. Here the search conducted was well within the *Chimel* guidelines. *See* United States v. Saunders, No. 72–2737, 476 F.2d 5 (5th Cir. 1973). The fact that Marshal Seybold chose to delay this search until the defendant was brought within the confines of the airport office does not detract from its validity. Westover v. United States, 394 F.2d 164 (9th Cir. 1968). Nor, as discussed above, can there be any doubt that the underlying arrest here was valid. This circuit has already stated that "the airport . . . is a critical zone in which special Fourth Amendment considerations apply." United States v. Moreno, 475 F.2d 44 (5th Cir. 1973). The arrest and search sustained in *Moreno* were far more questionable than those at issue here. However far Fourth Amendment protections go in the airport search context, they do not embrace the defendant in this case. *See also* United States v. Owens, 475 F. 2d 759 (5th Cir., 1973). *But cf.* United States v. Valen, 348 F.Supp. 1163 (M.D. Pa.1972).

E. The Defendant's Admissions in the Airport Office.

 The evidence adduced in the hearings held in this cause does not contain any substantial basis for finding that the defendant's statements in the airport office were illegally obtained.[7] Both Marshal Seybold and Group Supervisor Bush advised the defendant of his *Miranda* rights prior to interrogating him. Their questioning was not coercive or abusive, and the fact that Mr. Winstanley did not sign a waiver-of-rights form is not fatal to a finding of voluntariness. Hodge v. United States, 392 F.2d 552 (5th Cir. 1968). Nor do I believe this to be a case where the defendant's in-custody admissions must be excluded as the "poisonous fruit" of his improper concourse interrogation. *Cf.* Harrison v. United States, 392 U.S. 219,

---

7. The defendant's alleged oral admissions at the office of the Bureau of Narcotic and Dangerous Drugs were not put at issue by the present motion, so I do not pass on their validity here.

88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Consequently the defendant's request to suppress such statements must be denied.

The defendant's motion to suppress is granted in part and denied in part, in accordance with this opinion.