UNITED STATES of America, Plaintiff-Appellee,

v.

Roosevelt OLIVER, Defendant-Appellant.

No. 73–1699.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1974.

Decided Oct. 31, 1974.

302

Frederick F. Cohn, Chicago, Ill., for defendant-appellant.

William J. Mulligan, U. S. Atty., and Joseph P. Stadtmueller, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and CUMMINGS and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Appellant contends that his conviction of tax evasion rests on two separate violations of his Fifth Amendment right not to "be compelled, in any criminal case, to be a witness against himself." He argues (1) that he made a compelled disclosure of incriminating information without first receiving warnings required by *Miranda*[1] and *Dickerson;*[2] and (2) that under the rationale of *Marchetti*[3] he could not be compelled to disclose his illegal income on his tax return. Our evaluation of both arguments involves a consideration of the significance of the point at which the adversary character of the criminal prosecution commenced. We find merit in his first contention, but not in his second.

The indictment charged that defendant understated his adjusted gross income for 1970 and 1971. After a trial to the court, he was found not guilty on Count I, but guilty on the second count relating to 1971. His return for that year reported adjusted gross income of $6,030, including his wife's earnings and a loss of approximately $2,000 on a truck rental operation. His return made no reference to any other income and contained no entry or disclosure which might have been interpreted to relate to any illegal earnings.

Predicated on an analysis of defendant's net worth and expenditures during 1971, the government contended that his adjusted gross income was approximately $30,000 or, alternatively, crediting certain disputed testimony, could have been no less than $17,000.[4] Among the witnesses for the prosecution were one Samuel Coca, whose testimony suggested that trafficking in narcotics provided the defendant with a probable source of income not reported on his return, and Kermit Duehring, a special agent with the Intelligence Division of the Internal Revenue Service.

Duehring testified that in March or April, 1972, he had been directed to investigate a possible criminal violation of the internal revenue laws by the defendant. After that investigation had been under way for several months, he and another special agent interviewed the defendant in the offices of the Intelligence Division in the Federal Building in Milwaukee. Having learned that defendant was in the building in the vicinity of the grand jury room, the two agents located him and asked him to come to their offices. He acceded to their request. Prior to any questioning, the agents informed defendant of their offices and read him the written statement set out in the margin.[5]

---

1. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

2. United States v. Dickerson, 413 F.2d 1111 (7th Cir. 1969).

3. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889.

4. For a description of the "net worth" theory of proof of tax evasion, *see* Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; United States v. Cleveland, 477 F.2d 310 (7th Cir. 1973), and cases cited therein.

5. "As a Special Agent, one of my functions is to investigate the possibility of criminal violations of the Internal Revenue laws, and related offenses.

"In connection with my investigation of your tax liability, I would like to ask you some questions. However, first I advise you that under the Fifth Amendment to the Constitution of the United States I can not compel you to answer any questions or to submit any information if such answers or information might tend to incriminate you in any way.

"I also advise you that anything which you say and any information which you submit may be used against you in any criminal proceeding which may be undertaken.

During the course of the interview, which lasted about 45 minutes, a person who purported to have a message for defendant from his attorney was not permitted to communicate with defendant because, as Duehring testified, she did not possess written authorization from the attorney.

The government's case was predicated, in part, on the assumption that defendant's cash-on-hand on December 31, 1970, amounted to only $200. According to Duehring's testimony, the source of this information was a statement made by Oliver during his interview in the agents' office. Defendant's objections to Duehring's testimony were overruled on the ground that "the custody or rather the non-custody advice was adequate to meet the Constitutional requirement." Tr. 301.

## I.

The government does not attempt to defend the warnings given by Duehring as adequate if *Miranda* and *Dickerson* apply.[6] It is suggested that *Miranda* is inapplicable because defendant was not actually in custody, and that

---

"I advise you further that you may, if you wish, seek the assistance of an attorney before responding." (Tr. 297–8)

6. Oliver was not told that he could have counsel present during the questioning. In addition, the warning he was given on his right to remain silent contained an ambiguity that nullified its effectiveness. By informing Oliver that he need not give answers that might be incriminating, the agents seemed to suggest that he could be compelled to answer nonincriminating questions. This was hardly the "clear and unequivocal" warning of the right to remain silent required by *Miranda*, 384 U.S. at 467–468, 86 S.Ct. 1602. *See* United States v. Mullings, 364 F.2d 173, 175 (2d Cir. 1966). Additionally, the agents never ascertained whether Oliver understood the warnings. *Miranda* places "a heavy burden" on the government to show that a suspect has knowingly and intelligently waived his Fifth and Sixth Amendment rights. 384 U.S. at 475, 86 S.Ct. 1602. It is somewhat surprising to find that, some six years after *Miranda*, and three years after *Dickerson*, the I.R.S. continued to utilize warnings that failed to comply in these significant respects with the Supreme Court's mandate.

*Dickerson* should be re-examined in the light of our more recent decision in *Sicilia*;[7] in any event, it is claimed that the admission of Duehring's testimony was harmless error.

We recognize that the warnings specified in the Court's opinion in *Miranda* are not mandated by the Constitution itself,[8] and that our opinion in *Dickerson* has not been followed in other circuits.[9] Nevertheless, we are satisfied that as long as *Miranda* remains viable —as it certainly is today—its teachings must be applied to a situation such as that presented in *Dickerson* and in this case.

The application of *Miranda* does not turn on such a simple axis as whether or not the suspect is in custody when he is being questioned. As the Court repeatedly indicated, the prescribed warnings are required if the defendant is in custody "or otherwise deprived of his freedom of action in any significant way."[10] The fact of custody is emphasized in the opinion as having the practical consequence of compelling the accused to make disclosures.[11] But the test also

---

Our conclusion that these I.R.S. warnings were insufficient is not inconsistent with our recent decision in United States v. Horton, 503 F.2d 810 (7th Cir. 1974). The only contention raised in *Horton* was that the warnings given (idential to those here) with respect to an interrogation about tax liability did not adequately warn the defendant when the questions turned to his ownership of a firearm. The compliance of the warnings with *Miranda* was not at issue there.

7. United States v. Sicilia, 475 F.2d 308 (7th Cir. 1973).

8. *See* Michigan v. Tucker, 417 U.S. 433, at 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974).

9. *See* United States v. Dawson, 486 F.2d 1326, 1329 (5th Cir. 1973), and cases cited therein at n. 4.

10. *See* 384 U.S. at 444, 445, 467, 477, 478, 86 S.Ct. at 1629.

11. *See e. g.*, 384 U.S. at 457–458, 86 S.Ct. 1602.

differentiates between the questioning of a mere witness and the interrogation of an accused for the purpose of securing his conviction; the test serves the purpose "of determining when the adversary process has begun, i. e., when the investigative machinery of the government is directed toward the ultimate conviction of a particular individual and when, therefore, a suspect should be advised of his rights."[12]

■ Since the constitutional protection is expressly applicable to testimony in the criminal case itself, for the purpose of determining when warnings are required, the *Miranda* analysis treats the adversary proceeding as though it commences when a prospective defendant is taken into custody or otherwise significantly restrained. After that point is reached, it is not unreasonable to treat any compelled disclosure as protected by the Fifth Amendment unless, of course, the constitutional protection has been waived. Adequate warnings, or the advise of counsel, are essential if such a waiver is to be effective.

■ The requirement of warnings set forth in *Dickerson* rests on the same underlying rationale. While the commencement of adversary proceedings against Dickerson had not been marked by taking him into custody, the I.R.S., by assigning the matter to the Intelligence Division, had commenced the preparation of its criminal case. When the agents questioned him about his tax return, without clearly explaining their

mission, the dual criminal-civil nature of an I.R.S. interrogation created three key misapprehensions for the taxpayer.

"Incriminating statements elicited in reliance upon the taxpayer's misapprehension as to *the nature of the inquiry, his obligation to respond,* and *the possible consequences of doing so* must be regarded as equally violative of constitutional protections as a custodial confession extracted without proper warnings." 413 F.2d at 1116 (emphasis added).

The practical effect of these misapprehensions during questioning of a taxpayer was to "compel" him to provide information that could be used to obtain his conviction in a criminal tax fraud proceeding, in much the same way that placing a suspect under physical restraint leads to psychological compulsion.[13] Thus, the misapprehensions are tantamount to the deprivation of the suspect's "freedom of action in any significant way," repeatedly referred to in *Miranda*.

In this case it is plain that the purpose of the agents' interrogation of the defendant was to develop evidence which would secure his conviction of a crime. The criminal investigation of Oliver had commenced several months before he was questioned, and there was no ambiguity about the agents' mission. No doubt, as Duehring testified, Oliver was free to leave at any time, and therefore not strictly in custody. But since the agents were in a position to intercept a message from his attorney, and actually

12. The quotation is from Judge Will's opinion in United States v. Turzynski, 268 F. Supp. 847, 852 (N.D.Ill.1967), which was quoted with approval in *Dickerson*, 413 F.2d at 1115. The *Miranda* Court had emphasized that taking a suspect into custody marked an important turning point in the criminal proceeding:

"It is at this point that our adversary system of criminal proceedings commences, distinguishing itself at the outset from the inquisitorial system recognized in some countries." 384 U.S. at 477, 86 S.Ct. at 1629.

Earlier in that opinion, in a footnote referring to the phrase "otherwise deprived of

his freedom of action in any significant way," the Court added this significant footnote:

"This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." 384 U.S. at 444 n. 4, 86 S.Ct. at 1612.

13. As we noted in *Dickerson*, 413 F.2d at 1116, most taxpayers in such surroundings would be under a practical compulsion to respond to questions about their returns comparable to the psychological pressures described in *Miranda*.

did so, it is appropriate, for the purpose of applying the *Miranda* test, to characterize the situation as one in which defendant's liberty was significantly restrained.

As we emphasized in *Dickerson*, one purpose of the *Miranda* warnings is to make sure that the defendant does not misapprehend the nature of his obligation to respond to the revenue agents' inquiries. In this case, the warnings did not include advice that Oliver could remain silent or that he could have a lawyer present during the interview. Under these circumstances we believe *Miranda* requires us to treat his disclosures as though they were compelled during the course of an adversary proceeding, and therefore inadmissible at his criminal trial.

In United States v. Sicilia, 475 F.2d 308 (7th Cir. 1973), we refused to extend *Dickerson* to require F.B.I. agents to give *Miranda* warnings in connection with a request to the defendant for permission to search his company's premises for a stolen fork lift truck. In that opinion we emphasized the absence of the potential ambiguity in an F.B.I. inquiry as opposed to an investigation by special agents of the Internal Revenue Service as an adequate basis for distinguishing *Dickerson*. We might also have pointed out that until after the lift truck was actually discovered on the premises, the investigation had not progressed to the point at which the agents were prepared to make an accusation against Sicilia; when the matter did reach that point, they gave him complete *Miranda* warnings.[14] Neither the holding in *Sicilia* nor the language in that opinion would justify a refusal to apply *Dickerson* in this case.

■ The incriminating evidence obtained from defendant's interrogation was inadmissible. That information was utilized by the government in computing Oliver's understatement of taxable income by the net worth method.[15] Specifically, the government's calculation of Oliver's cash-on-hand at the beginning of the tax year relied heavily on the admissions.[16] In view of the importance of establishing the taxpayer's opening net worth with "reasonable certainty," *see* Holland v. United States, 348 U.S. 121, 132, 75 S.Ct. 127, 99 L.Ed. 150, we must reject the argument that the error was harmless.[17]

## II.

The government's evidence indicated that the probable source of defendant's unreported income was the sale of narcotics. Relying on Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L. Ed.2d 889, appellant contends that his conviction must be reversed because the Fifth Amendment protects him from

14. It was the discovery of the lift truck, coupled with Sicilia's statement that he had purchased it, that precipitated the full *Miranda* advice. These facts are emphasized at page 311 of 475 F.2d.

15. During the August 23, 1972, interrogation Oliver gave the I.R.S. agents several pieces of information relevant to his opening net worth on January 1, 1971. In response to questioning, he informed them that he normally kept at most a couple of hundred dollars cash on hand. He stated that the Christmas Club checks received by his wife had been entirely spent by January 1, 1971.

16. As government exhibit 59, the government's worksheet, shows, Oliver's cash-on-hand figures for the beginning and end of 1971 were calculated on the basis of Oliver's statement that he normally had "a couple of hundred dollars" on hand and that a cashier's check was purchased from 1971 funds. Apart from Oliver's admissions as to these facts, there is little in the record to establish what Oliver's cash position was. Special Agent Duehring, the government's chief investigating officer, testified that the I.R.S. investigation disclosed no other evidence about Oliver's cash-on-hand, but the government did not ask the agent to elaborate as to the actions the government took to arrive at this conclusion. Thus, only the agent's assertion that no other evidence was found is in the record.

17. As Special Agent Duehring admitted on cross-examination (Tr. 350), the presence of a large amount of cash at the beginning of the year could mean that large personal expenditures would be consistent with a low reported income.

any compelled disclosure of his illegal activities. We have no doubt, however, that the rationale of the *Marchetti* decision is inapplicable to the requirement that all taxpayers, including those engaged in illegal ventures, report their incomes in full.

In *Marchetti*, the failure to pay a federal wagering occupation tax or to register as one engaged in the business of accepting wagers was excused on Fifth Amendment grounds. The Court noted that the statute was applicable only to a select group of persons engaged in a kind of activity which was unlawful in most states and that the statute required the Internal Revenue Service to provide local prosecuting officers with the names of persons who paid the tax. As Mr. Justice Brennan pointedly observed in his concurring opinion in Grosso v. United States, such requirements unambiguously evidenced a dominant congressional purpose to develop evidence for the purpose of criminal prosecution and conviction. He stated:

"The cases before us present a statutory system condemned by *Albertson* [v. SACB, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165]. The wagering excise tax, the occupational tax, and the registration requirement are only parts of an interrelated statutory system for taxing illegal wagers. *Whatever else Congress may have meant to achieve, an obvious purpose of this statutory system clearly was to coerce evidence from persons engaged in illegal activities for use in their prosecu-*

*tion.* See United States v. Kahriger, 345 U.S. 22, 37, 73 S.Ct. 510, 517, 97 L.Ed. 754 (Frankfurter, J., dissenting)." 390 U.S. 62, 74, 88 S.Ct. 709, 717, 19 L.Ed.2d 906 (emphasis added).

■ The enactment of special legislation designed to procure incriminating disclosures from a select group of persons engaged in criminal conduct was tantamount to an accusation commencing criminal proceedings against them. The statutory demand to register as a gambler was comparable to the inquisitor's demand that a suspect in custody admit his guilt.[18] The admission, once made, would almost inevitably become a part of the record of a criminal proceeding against a person who had already been accused when he confessed. Just as the *Miranda* decision may be read as having enlarged the adversary proceeding to commence when the accused is first taken into custody, *Marchetti* and comparable cases[19] have, for Fifth Amendment purposes, treated special statutes designed to secure incriminating information from inherently suspect classes of persons as the commencement of criminal proceedings against those from whom incriminating information is demanded.[20] Under this analysis, we must test the applicability of the Fifth Amendment to a self-reporting statute at the time that disclosure is compelled.

■ The statute which defendant Oliver is accused of violating is applicable to the public at large, and its demands for information are neutral in the sense that they apply evenly to the

---

18. In his dissent in United States v. Kahriger (which was overruled by *Marchetti*), Mr. Justice Black stated:

    "Whether or not the Act has this effect, I am sure that it creates a squeezing device contrived to put a man in federal prison if he refuses to confess himself into a state prison as a violator of state gambling laws. . . . But we have a Bill of Rights that condemns coerced confessions, however refined or legalistic may be the technique of extortion." 345 U.S. 22, 36–37, 73 S.Ct. 510, 519.

19. Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d

165; Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906; Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923; Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57.

20. As Mr. Justice Harlan stated in his concurring opinion in California v. Byers, 402 U.S. 424, 458, 91 S.Ct. 1535, 29 L.Ed.2d 9, a subsequent trial after compliance with a *Marchetti*-type statute would be "merely [a] ritualistic confirmation of the 'conviction' secured through compliance with the reporting requirement in issue."

few who have illegal earnings and the many who do not. The self-reporting requirements of the Internal Revenue Code are justified by acceptable reasons of policy, entirely unrelated to any purpose to obtain incriminating evidence against an accused person or group.[21] Therefore, even though the disclosure of defendant's illegal income was compelled by statute, and even though we assume that such disclosure might well have been incriminating, the *Marchetti* holding does not justify the conclusion that the Fifth Amendment excuses defendant's obligation to report his entire income.[22]

That amendment does not purport to forbid every compelled disclosure which contains incriminating information. In terms it applies only to testimony in "any criminal case." That concept has been interpreted to encompass testimony before a grand jury, testimony in certain civil proceedings, responses to custodial interrogation, and statutory demands for information from selected groups of persons engaged in inherently suspect activities. With one exception, however,[23] we find no precedent for enlarging the concept further to include the preparation and filing of the customary income tax return. Accordingly, without considering every hypothetical case in which a demand for information on a tax return might be challenged,[24] we have no hesitation in holding that the Fifth Amendment has no application to the statutory requirement that every citizen must report his entire income even if a taxpayer is thereby compelled to disclose an incriminating fact.[25]

### III.

For the reasons stated in Part I, the judgment must be reversed and the case remanded for a new trial. In view of

---

21. In his concurring opinion in United States v. Kahriger, Mr. Justice Jackson observed: "The United States has a system of taxation by confession. That a people so numerous, scattered and individualistic annually assesses itself with a tax liability, often in highly burdensome amounts, is a reassuring sign of the stability and vitality of our system of self-government. What surprised me in once trying to help administer these laws was not to discover examples of recalcitrance, fraud or self-serving mistakes in reporting, but to discover that such derelictions were so few. It will be a sad day for the revenues if the good will of the people toward their taxing system is frittered away in efforts to accomplish by taxation moral reforms that cannot be accomplished by direct legislation." 345 U.S. at 36, 73 S.Ct. at 517.

It might also undermine the goodwill of the people toward their taxing system to place the law violator in a preferred status with respect to his obligation to report his entire income.

22. As Mr. Justice Holmes stated in his oft-quoted dictum in United States v. Sullivan, 274 U.S. 259, 263–264, 47 S.Ct. 607, 71 L. Ed. 1037, "It would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime."

23. *See* Garner v. United States, 500 F.2d 228 (9th Cir. 1974) (en banc), and Comment, Reporting Illegal Gains as Taxable Income: A Compromise Solution to a Prosecutorial Windfall, 69 Nw.U.L.Rev. 111, 141–142 (1974).

24. We note that the indictment here, as in United States v. Garcilaso de la Vega, 489 F.2d 761, 765 (2d Cir. 1974), was based on Oliver's failure to state the amount, and not the source, of his income. Had he correctly reported the amount of his illegal income, but refused to supply information arguably requested (or regularly used) for the purpose of identifying criminal activity, a different Fifth Amendment issue would arise.

25. There is clearly a lesser basis for treating the filing of a normal income tax return as a disclosure compelled for the purpose of securing the taxpayer's conviction of a crime than the self-reporting requirement in the California statute sustained by the Supreme Court in California v. Byers, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9. The Court's holding that use immunity was not required because there was an insufficient correlation between a statutory requirement that a driver report his involvement in an accident and the possible criminal prosecution of the driver to make the Fifth Amendment applicable to that statute would seem to apply *a fortiori* to the statute before us. *See* 402 U.S. at 431, 91 S.Ct. 1535.

Judge Gordon's familiarity with the complexities of this net worth prosecution, and in view of the fact that the case was tried to the court, and there- fore it may not be necessary to repeat testimony already received,[26] Circuit Rule 23 shall not apply.[27]

Reversed and remanded.

26. As the only improperly admitted evidence was that obtained as a result of the August 23, 1972, interrogation, it would seem appropriate to use much of the original record in lieu of taking additional testimony.

27. We have considered and found no merit in defendant's objection to the testimony of the tax accountant, or to his claim that he did not have an adequate opportunity to cross-examine the witness Coca.