JOHN W. SINGLETON, A.K.A. JOHN WESTLY, A.K.A. JOHN SINKLER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9680-74.    Filed March 18, 1976.

---

*Laurence Goldfein, Ira L. Tilzer,* and *Richard A. Levine,* for the petitioner.
*Michael K. Phalin,* for the respondent.

1128

1130

1132

OPINION

The first issue is procedural. During the discovery process, after numerous hearings and after the case was at issue, respondent filed a motion for protective order requesting that we stay further proceedings pending the final disposition of a criminal indictment returned against petitioner the previous week. We denied respondent's motion for protective order.

The petition in this case was filed on December 11, 1974. Because of the time required for disposition of issues raised by petitioner in motions filed after respondent filed his answer, the reply was not filed until September 2, 1975, which, under our rules, is the time that the case was at issue. On October 30, 1975, the case was set for trial in New York City on March 22, 1976. Petitioner was indicted for income tax evasion on December 23, 1975.

The indictment of petitioner for income tax evasion covered only the taxable year 1969. The case before us involves deficiencies in income tax and fraud penalties for the taxable years 1969, 1970, 1971, and 1972. A jeopardy assessment was made against petitioner in August 1974 and payments arising from levies and seizures of property pursuant to the jeopardy assessment were made in August 1974.

Respondent's motion for protective order under Rule 103(a)(1), (2), and (4) of our Rules of Practice and Procedure is based upon two events. One of the events is the action of the United States Supreme Court on June 6, 1975, in granting certiorari in *United States v. Janis,* docket No. 74-958. Why respondent waited over 6 months to request a stay in our proceedings on such a basis is not clear. During the interim period from the time certiorari was granted and the time respondent requested the protective order the following actions were taken: (1) We issued an order disposing of petitioner's motions; (2) petitioner filed a motion for reconsideration; (3) petitioner filed his reply; (4) petitioner filed a motion to set the case for trial; (5) we held a hearing on the motions in Washington; (6) we issued an order denying petitioner's motion for reconsideration but granted petitioner's motion setting the case for trial and set the case for trial; (7) petitioner filed a motion to compel production of documents and a motion for an order granting a hearing to determine whether petitioner's constitutional rights were violated; (8) we held a hearing on those two motions in Washington and we issued an order denying the motion to compel production of documents and granted the motion for a hearing on whether petitioner's constitutional rights were violated; (9) petitioner filed a motion for reconsideration; and (10) we held a hearing on the motion for reconsideration.

The case of *United States v. Janis, supra,* involves the excise imposed upon wagering. The assessment was based upon evidence illegally obtained from the taxpayer. The District Court suppressed the evidence, quashed the assessment, and shifted the burden of proof to the Government. It found as a fact that the information upon which the assessment was based did not come from any source independent of the illegal search and seizure. The Court of Appeals for the Ninth Circuit affirmed in an unpublished opinion and the Supreme Court granted certiorari.

When respondent filed his motion for protective order there was no evidence as to the extent that the statutory notice of deficiency was based upon evidence illegally obtained; moreover, it was not established whether *any* evidence was illegally obtained. Therefore, the opinion of the Supreme Court in *Janis* may or may not have any bearing on the issues presented in the instant case. To hold petitioner's case in abeyance pending the outcome of a case which is of uncertain application while petitioner's assets are in the Government's control under a jeopardy assessment appears inappropriate after actively pursuing discovery and preparation for trial some 6 months after the Supreme Court granted certiorari. Respondent's second ground for the protective order rests upon the indictment of petitioner for income tax evasion 1 week before respondent filed his motion. Respondent argues that petitioner seeks evidence in the instant case to which he would not be entitled in the criminal case and he relies primarily upon *Campbell v. Eastland,* 307 F. 2d 478 (5th Cir. 1962), cert. denied 371 U.S. 955 (1963).

That case involved a possible criminal prosecution under consideration by the United States Attorney for the Eastern District of Texas at a time when the taxpayer filed a suit for refund in the Northern District of Texas after which petitioner promptly filed a motion for production of documents in the civil proceeding. The civil proceeding was transferred to the Eastern District of Texas. The Court found that the filing of the suit for refund, or at least the discovery motion, was a tactical maneuver for the taxpayer to gain advance information as to the criminal case. After a hearing, the District Court ordered the Government to turn over its files which it refused to do. The Court then entered judgment in favor of the taxpayer in the civil refund suit. The Government appealed and the Court of Appeals reversed and remanded.

We agree with the Court of Appeals but conclude that the instant case is distinguishable. The court pointed out that the matter is one in the discretion of the trial court, describing that discretion as follows:

(1) There is a clear-cut distinction between private interests in civil litigation and the public interest in a criminal prosecution, between a civil trial and a criminal trial, and between the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure. But these distinctions do not mean that a civil action and a criminal action involving the same parties and some of the

same issues are so unrelated that in determining good cause for discovery in the civil suit, a determination that requires the weighing of effects, the trial judge in the civil proceeding should ignore the effect discovery would have on a criminal proceeding that is pending or just about to be brought. The very fact that there is a clear distinction between civil and criminal actions requires a government policy determination of priority: which case should be tried first. Administrative policy gives priority to the public interest in law enforcement. This seems so necessary and wise that a trial judge should give substantial weight to it in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities.

   \* \* \*

A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal suit. Judicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other. In some situations it may be appropriate to stay the civil proceeding. United States v. Bridges, N.D. Calif. 1949, 86 F. Supp. 931. In others it may be preferable for the civil case to proceed—unstayed. In the proper case the trial judge should use his discretion to narrow the range of discovery. Here, however, the trial judge seemed to think that he had no discretion—once discovery was moved for in a civil suit. [307 F.2d at 487.]

When we denied respondent's motion for protective order we were not operating under the misapprehension which the Court of Appeals described of the District Court. We carefully weighed the various factors and concluded that the matter was discretionary. Initially we point out that we did not permit unlimited discovery but only very limited discovery under the careful scrutiny of our in camera inspection of respondent's files. The discovery was limited to the sole factual situation of showing whether the Commissioner's examination of petitioner's income tax returns resulted from a search of petitioner at Kennedy Airport as he boarded an airplane to leave the United States. Such facts were solely within the knowledge of respondent and petitioner needed the facts to move to suppress illegally obtained evidence if he could show that the airport search was illegal. We set that matter for hearing *before* petitioner was indicted.

Here, as distinguished from *Campbell v. Eastland,* the Commissioner made a jeopardy assessment against petitioner. That procedure required him to issue a statutory notice of deficiency within 60 days. Sec. 6861(b), I.R.C. 1954. Electing to take that step the Commissioner could anticipate that petitioner would invoke the jurisdiction of the Tax Court and if a criminal

prosecution were to be instituted it should be done promptly to proceed ahead of the civil case. The Commissioner has been well aware of these procedural problems since 1958. *Commissioner v. Peter Licavoli,* 252 F.2d 268 (6th Cir. 1958), affg. a Memorandum Opinion of this Court. In the instant case petitioner was not indicted until some 16 months after the Commissioner made his jeopardy assessment. Speculation as to the cause for the delay would serve no useful purpose.

The Court of Appeals in *Campbell v. Eastland, supra,* enumerated the elements to be used in balancing the individual's rights to prepare his civil case promptly against the public interest in withholding full disclosure sought by the taxpayer. In applying those tests to the instant case the following material distinctions are readily apparent: (1) Here the motion for discovery was not for the purpose of obtaining the otherwise unobtainable reports because the discovery motions had been pending before us for many months before petitioner was indicted and they were needed to prepare for an evidentiary hearing set before petitioner was indicted; (2) here the Commissioner was not defending a suit for refund but he, instead, had made a jeopardy assessment and mailed a statutory notice of deficiency in which he claimed deficiencies in income taxes and fraud penalties aggregating $143,526.55. He seized petitioner's property in satisfaction of the assessment and had been holding the property for over 16 months while petitioner proceeded in the Tax Court along the only procedural lines available to him to recover his property; (3) no other remedies were available to petitioner to obtain the facts he needed for the evidentiary hearing on the constitutional issue; and (4) the success of petitioner's contention on the constitutional issue was not based upon the truth or falsity of his own financial affairs or records but instead upon facts within the sole knowledge of respondent and his agents. At the time respondent filed his motion for protective order we had set for an evidentiary hearing the matter of possible violation of petitioner's constitutional rights which, if decided in favor of petitioner, would in all probability dispose of the criminal case as well as the civil case. The civil case had also been set for trial several months. At that point in time, we were "well down the road" in the civil suit when petitioner was indicted. Our holding, we conclude, is in accord with the discretion accorded a trial court by the rationale of *Campbell v.*

*Eastland, supra.* Because the matter is discretionary, our holding here should not be interpreted to mean that we would not grant a protective order under different circumstances. Respondent pointed out at the hearing that we have the identical situation pending before us in *Robert Gonzer,* docket No. 102-75, and in *Oliver J. and Estelle Schwabe,* docket Nos. 5728-74, 4580-75, and 5163-75. *Schwabe* has since been disposed of on another basis. Because the matter is discretionally and factually distinguishable, no reason existed for not ruling on the motion when we did.

Respondent points out that once petitioner obtained the evidence which he sought in the civil proceeding he could invoke the fifth amendment privilege against self-incrimination which he, in fact, had done in response to discovery requests made by the Commissioner. Respondent overlooks the fact that the matters sought by petitioner for the evidentiary hearing were facts solely within the knowledge of respondent and his agents. The situation could never arise, nor did it arise at the evidentiary hearing, where petitioner would invoke his fifth amendment privilege as to the facts petitioner sought from respondent's files because petitioner could never testify as to the relationship of the airport search to the Commissioner's investigation of petitioner's income tax returns.

Respondent has cited no cases factually similar to the instant case to convince us that we erred in refusing to grant his motion for protective order and stay our proceedings pending final disposition of the criminal case.

The second issue is substantive. Petitioner contends that the search conducted at Kennedy International Airport on December 7, 1972, was in violation of his rights guaranteed by the fourth amendment to the United States Constitution and, therefore, all leads obtained as a result of the search must be suppressed. Respondent, on the other hand, takes the position that (1) petitioner implicitly consented to the airport search and (2) the search was "reasonable" under the circumstances, and thus the motion to suppress, to the extent it relates to leads emanating from the airport search, should be denied.

The fourth amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation,

and particularly describing the place to be searched, and the persons or things to be seized.

It is well-settled that evidence obtained in violation of an individual's fourth amendment rights is inadmissible in a criminal trial. Furthermore, it has been the position of this Court since our decision in *Efrain T. Suarez,* 58 T.C. 792 (1972), that the protection of the fourth amendment extends to civil tax proceedings. Cf. *Elmer J. Brod,* 65 T.C. 948 (1976).

Respondent first argues that petitioner implicitly consented to the search by continuing to proceed to board the airplane despite the presence of signs warning of the search and the fact that he saw others ahead of him being frisked. With this theory of consent, we cannot agree. Compelling one to choose between exercising his fourth amendment rights and his right to travel constitutes a form of coercion, however subtle; the respondent cannot be said to have established that petitioner freely and voluntarily consented to the search when to do otherwise would have meant foregoing the constitutional right to travel. *United States v. Albarado,* 495 F.2d 799 (2d Cir. 1974); *United States v. Kroll,* 481 F.2d 884, 886 (8th Cir. 1973). While it may be argued that there are often other forms of transportation available, it would impose a substantial hardship on many air travelers to be forced to use an alternate form of transportation, assuming one exists at all.

Respondent's reliance upon *United States v. Williams,* 516 F.2d 11 (2d Cir. 1975), and *United States v. Doran,* 482 F.2d 929 (9th Cir. 1973), is misplaced. Both cases dealt with the legality of search of carry-on luggage, rather than a personal frisk. The *Williams* panel based its holding on the following passage from Judge Oakes' concurrence in *United States v. Edwards,* 498 F.2d 496, 501, 504 (2d Cir. 1974):

All baggage is not generally subject to search according to the FAA's directives; rather, only carry-on baggage is generally subject to search. Thus, one is not forced to choose between flying to one's destination and having one's baggage searched. Rather one may merely consign any baggage he does not want searched to the baggage compartment. The only imposition upon the passenger then is not having the bag during the flight and, perhaps, a little wait at the destination for his luggage. *Clearly this is not the same case involved when the only way to avoid search is to forego flying. The conclusion, therefore, must be that a carry-on luggage search, unlike the personal search, may be justified on a consent basis.* [Emphasis added. Fn. ref. omitted.]

Preboarding searches of passengers and their carry-on luggage must be tested by the fourth amendment's general proscription against unreasonable searches and seizures, because as a practical matter an airport search could not be subjected to the warrant procedures. *United States v. Albarado, supra* at 804; *United States v. Slocum,* 464 F.2d 1180, 1183 (3d Cir. 1972); *United States v. Epperson,* 454 F.2d 769, 771 (4th Cir. 1972). The fourth amendment forbids only those searches and seizures that are unreasonable. *Elkins v. United States,* 364 U.S. 206, 222 (1960). Therefore, the ultimate standard on which we must base our decision is one of reasonableness. *Cady v. Dombrowski,* 413 U.S. 433 (1973); *United States v. Slocum, supra* at 1182. The reasonableness of a search depends upon the facts and circumstances and the total atmosphere of each case. *Chimel v. California,* 395 U.S. 752, 765 (1969). The reasonableness of any search must be determined by balancing the Government interest in searching against the invasion of privacy which the search entails. These interests must be balanced at two stages: (1) The search must be "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 19 (1968); *United States v. Epperson, supra* at 771.

The search of petitioner was conducted pursuant to a nationwide program to prevent aircraft hijacking.[3] The need to prevent such hijackings is unquestionably grave and urgent.[4] The potential damage to persons and property from such acts is enormous. Thus, there is clearly a compelling need to detect the presence of weapons and explosives before they are brought onto an airplane. While this might justify some search of all prospective passengers at an airport, the question becomes whether it will justify, in any given case, the search as carried out and, for this case, the frisk of petitioner. We recognize that a frisk normally involves a gross invasion of one's privacy. In *Terry v. Ohio, supra,* the Supreme Court rejected the claim that a frisk is only a "petty indignity."

Courts which have dealt with airport searches have utilized various approaches in ruling on the validity of the search. A number of Federal cases have applied the test of *Terry v. Ohio,* 392 U.S. 1 (1968), in determining whether the particular search

---

[3] See *United States v. Davis,* 482 F.2d 893, 897-904 (9th Cir. 1973).
[4] See *United States v. Epperson,* 454 F.2d 769, 771 (4th Cir. 1972).

in question violated the accused's fourth amendment rights. See, e.g., *United States v. Clark,* 498 F.2d 535 (2d Cir. 1974); *United States v. Albarado, supra; United States v. Fern,* 484 F.2d 666 (7th Cir. 1973); *United States v. Ruiz-Estrella,* 481 F.2d 723 (2d Cir. 1973); *United States v. Moreno,* 475 F.2d 44 (5th Cir. 1973); *United States v. Slocum,* 464 F.2d 1180 (3d Cir. 1972).

In *Terry v. Ohio, supra,* the Supreme Court, in upholding the validity of a frisk conducted by a plainclothes detective without a warrant or probable cause to arrest, stated at page 30:

Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

But in order to justify the particular intrusion, the Court held that "the police officer must be able to point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio, supra* at 21. Therefore, the cases applying *Terry v. Ohio, supra,* in the context of an airport search have generally upheld the validity of a frisk or inspection of carry-on luggage where the official who conducted the search was able to articulate specific facts which aroused his suspicion of danger. However, these cases have allowed a lower level of suspicion than that required in *Terry v. Ohio, supra,* in view of the limited time available and the substantial potential consequences.

Some courts have utilized approaches other than the *Terry* standard in ruling on the validity of airport searches. For example, in *United States v. Skipworth,* 482 F.2d 1272 (5th Cir. 1973), the Fifth Circuit stated:

Necessity alone, however, whether produced by danger or otherwise, does not in itself make all non-probable-cause searches reasonable. Reasonableness requires that the courts must weigh more than the necessity of the search in terms of possible harm to the public. The equation must also take into account the likelihood that the search procedure will be effective in averting potential harm. On the opposite balance we must evaluate the degree and nature of intrusion into the privacy of the person and effects of the citizen which the search entails. [482 F.2d at 1275.]

\* \* \*

Our conclusion, after this tripartite weighing of the relevant factors, is that the standards for initiating a search of a person at the boarding gate should be no more stringent than those applied in border crossing situations. In the critical pre-boarding area where this search started, reasonableness does not require that officers search only those passengers who meet a profile or who manifest signs of nervousness or who otherwise appear suspicious. Such a requirement would have to assume that hijackers are readily identifiable or that they invariably possess certain traits. The number of lives placed at hazard by this criminal paranoia forbid taking such deadly chances. \* \* \* we hold that those who actually present themselves for boarding on an air carrier, like those seeking entrance into the country, are subject to a search based on mere or unsupported suspicion. [482 F.2d at 1276.]

The Ninth Circuit, on the other hand, in *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973), has upheld the validity of preboarding screening of prospective passengers on the basis of a series of Supreme Court cases relating to "administrative searches." The essence of these decisions is that searches conducted as part of a regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, may be permissible under the fourth amendment though not supported by a showing of probable cause directed to a particular place or person to be searched. However, the court placed the following limitations upon the screening of passengers and their immediate possessions:

As we have seen, however, the need for some limitations upon these rights is clear. In light of that need, a screening of passengers and of the articles that will be accessible to them in flight does not exceed constitutional limitations provided that the screening process is no more extensive nor intensive than necessary, in the light of current technology, to detect the presence of weapons or explosives, that it is confined in good faith to that purpose, and that potential passengers may avoid the search by electing not to fly. [Fn. ref. omitted. 482 F.2d at 913.]

The Third Circuit, the Court of Appeals to which an appeal from our decision herein will lie, has applied the *Terry* test in the two airport search cases which it has decided. *United States v. Slocum,* 464 F.2d 1180 (3d Cir. 1972); *United States v. Lindsey,* 451 F.2d 701 (3d Cir. 1971). In the instant case, respondent has failed to show the existence of any specific facts which aroused the suspicions of the customs officials or the airline personnel

prior to the frisk. Consequently, the frisk in the instant case cannot be upheld under the principles enunciated in *Terry v. Ohio, supra.* Despite the fact that the Third Circuit has applied *Terry* in the two airport search cases decided by it, it has never expressly adopted the *Terry* rule for application in all such cases nor has it ever invalidated an airport search on the basis of *Terry.* Therefore, we do not feel constrained to apply the *Terry* rule in the instant case under our holding in *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). However, for reasons stated below, we need not determine whether the frisk was "justified at its inception" and thus the adoption of one of the above approaches is unnecessary for the disposition of the search issue.

Assuming arguendo the legality of the initial "patdown" of petitioner, we find that the removal of the packets of currency from the inside pockets of petitioner's coat exceeded the scope of the search permissible under the circumstances. "The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation possible." *Terry v. Ohio,* 392 U.S. 1, 19 (1968). Thus, a search which is reasonable at its inception may violate the fourth amendment by virtue of its intolerable scope and intensity. *Kremen v. United States,* 353 U.S. 346 (1957). We recognize from the outset that the weaponry of the skyjacker is not limited to the conventional weapons used by bank robber or burglar; his arsenal may include explosives.

"A permissible search is an inspection of that which may *reasonably* be deemed to conceal a weapon or explosive. Reasonableness, in this context, is a matter of probabilities." *United States v. Kroll,* 481 F. 2d 884, 886 (8th Cir. 1973), quoting 351 F. Supp. 148, 153 (W.D. Mo. 1972). We find it doubtful that the official frisking petitioner believed, upon feeling the two packets of currency and the passport from the outside of petitioner's coat, that his inside pockets contained weapons or explosives. There is no evidence that the customs official detected the presence of a solid object within petitioner's coat which he believed might be a weapon. Evidence of such a belief or another similar compelling reason is required to justify the greater intrusion. Respondent, the party on whom the burden of proof rests,[5] not only failed to produce such evidence, but did

---

[5] Once petitioner "has presented a prima facie case of illegal search, the government must assume the burden of proof that any search made was lawful." *United States v. Thompson,*

not even introduce the testimony of the official who conducted the search of petitioner, nor did he attempt to explain his failure to do so. Yet, respondent, in his memorandum of law, requests us to find facts that could have been established by the customs official who searched petitioner. Respondent's unexplained failure to call as a witness the U.S. Customs official whose name and number appear on the Form 4790 dated December 7, 1972, bearing the signature of petitioner, gives rise to the inference that any proof, if offered, would have been unfavorable. *Interstate Circuit v. United States,* 306 U.S. 208 (1939); *Wichita Terminal Elevator Co.,* 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Furthermore, at the hearing, Brian Gilroy, a former New York City police officer, who during his career had conducted several hundred frisks, performed a frisk of petitioner. In order to reconstruct the circumstances of the airport frisk as nearly as possible, a passport and a plastic envelope containing 100 $1 bills were placed in one of the inside pockets of petitioner's suit coat while a similar plastic envelope was placed in the other inside pocket. After frisking petitioner, Mr. Gilroy concluded that petitioner was "clean." Upon further questioning, he stated that he would only have reason to believe that petitioner's pockets contained small pads or notebooks. We conclude on the facts of this case that the probabilities of the situation were such that the removal of the packets of currency from petitioner's pockets was unreasonable and thus in violation of his fourth amendment rights. Respondent has simply failed to establish that the customs official had reason to believe that petitioner's inside pockets contained weapons or explosives, thus warranting the greater intrusion. We recognize that there is a need for a flexible standard in determining the level of belief which should be imposed on law enforcement officials.

We must now decide what evidence, if any, must be suppressed as a result of our holding that the airport search was conducted in violation of petitioner's fourth amendment rights. Two principles are important in deciding this issue. First, the burden is upon the Government in a criminal proceeding to establish that the evidence to be introduced at trial is not tainted. *United States v. Cales,* 493 F.2d 215 (9th Cir. 1974); *United States v. Cole,* 463 F.2d 163 (2d Cir. 1972). We need not decide whether respondent

409 F.2d 113, 117 (6th Cir. 1969).

has such a burden in a civil tax proceeding because of our finding as to the tainted evidence discussed hereafter. Second, "evidence discovered 'as a result of both legal and illegal leads' is inadmissible, even though 'the legal lead would itself probably have sufficed to uncover the evidence.'" *United States v. Schipani,* 414 F.2d 1262 (2d Cir. 1969).

Petitioner, relying primarily upon the decisions in *United States v. Schipani,* 289 F. Supp. 43 (E.D.N.Y. 1968), affd. 414 F.2d 1262 (2d Cir. 1969), and *Wong Sun v. United States,* 371 U.S. 471 (1963), takes the position that all evidence discovered during the course of the investigation must be suppressed for the following reasons: (1) The investigation would not have been initiated *but for* the illegal search and (2) all evidence eventually gathered emanated from information contained on the Form 4790. Petitioner's first argument is based upon the following language in the District Court's opinion in *United States v. Schipani, supra* at 62:

If illegally secured information leads the government to substantially intensify an investigation, all evidence subsequently uncovered has automatically "been come at by exploitation of that illegality." The unlawful search has set in motion the chain of events leading to the government's evidence.

Petitioner maintains on the basis of this language that if an investigation is not merely intensified, but is initiated as a result of an illegal search, all evidence has been arrived at by exploitation of that illegality and must be suppressed.

The language from *Schipani,* upon which petitioner relies, is dictum because the Government, in that case, sustained its burden of proof by showing that the investigation was *not* intensified by use of the illegally obtained evidence. The dictum is, in turn, based upon interpretations of opinions which the District Court in *Schipani* concluded had undermined the decision of the Second Circuit in *United States v. Nardone,* 127 F.2d 521 (2d Cir. 1942). In *Nardone,* the Second Circuit refused to suppress evidence where the information obtained by an illegal wiretap admittedly "spurred the authorities to press an investigation which might otherwise have been dropped." (127 F.2d at 523.) Subsequent to *Schipani,* the Second Circuit has made it clear that *Nardone* had not been undermined and the District Court in *Schipani* erroneously concluded that *Nardone* did not continue to be the law in the Second Circuit. *United*

*States v. Friedland,* 441 F.2d 855 (2d Cir. 1971). In *United States v. Cole,* 463 F.2d 163 (2d Cir. 1972), the Second Circuit made the following observation at page 172:

It seems not to be sufficiently realized that the *holding* of the district court in *Schipani,* 289 F. Supp. 43 (E.D.N.Y. 1968), which we affirmed, was that the Government had met its burden of showing by a preponderance of the evidence that it would have launched the saturation investigation which developed the evidence leading to Shipani's conviction even if no information had been received from illegal electronic surveillance of a travel bureau. It was with respect to this—not to everything *said* in the course of a 22-page opinion by the district judge—that Judge Jameson, writing for the court, "approve[d] the legal principles applied." 414 F.2d at 1266. [Fn. ref. omitted.]

We conclude that *Nardone* not the dictum in *Schipani* states the law in the Second Circuit; i.e., use of illegally obtained evidence to *intensify* the investigation does not taint the evidence subsequently acquired.

Moreover, the argument that evidence is tainted merely because it would not have been discovered *but for* the primary illegal invasion, has been rejected in numerous cases. *United States v. Brandon,* 467 F. 2d 1008 (9th Cir. 1972); *United States v. Fike,* 449 F.2d 191 (5th Cir. 1971); *United States v. Bacall,* 443 F. 2d 1050 (9th Cir. 1971); *United States v. Friedland, supra.*

*United States v. Bacall, supra,* involved an investigation by customs officials directed at misdescription of goods which resulted in the discovery of understatement of purchase prices. The information which triggered the investigation of misdescription was obtained as a result of an illegal seizure. The issue was whether the evidence of the purchase price understatement was tainted. The Ninth Circuit stated that rather than a "but for" test, the proper standard to be applied was whether the illegally seized information "tended significantly" to direct the investigation toward the specific evidence in question. Seven criteria were used in applying the test. Without discussing each in detail, a comparison will indicate the similarity between the instant case and the *Bacall* case in which the court held the evidence to be admissible. In addition, in this case, unlike *Bacall,* the illegal search did not reveal the existence of *any* illegal activity. Although we find the *Bacall* holding and analysis persuasive with respect to the issue of taint, we only make reference to it in support of our conclusion that the *but for*

connection between the search and the initiation, intensification, and culmination of the tax investigation is not dispositive of the question of taint. Instead, we must determine whether the evidence has been obtained as a result of the illegally obtained leads contained on the Form 4790, or whether, as contended by respondent, the connection between the tainted leads and the evidence to be introduced at trial has "become so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341 (1939).

Petitioner contends that under *Wong Sun v. United States, supra,* all evidence must be suppressed because the illegal search provided "the leads to all the information which was eventually gathered during the investigation of petitioner." *Wong Sun* involved the review of Wong Sun's and James Wah Toy's convictions for fraudulent and knowing transportation and concealment of illegally inported heroin. Toy was illegally arrested at his home by Federal narcotic agents, at which time he identified Johnny Yee as a person who had been selling narcotics. The agents then went to the home of Yee, who surrendered heroin to them and stated that it had been brought to him by Toy and an individual known as "Sea Dog." Toy soon identified this person as Wong Sun and took the agents to his home where Wong Sun was also illegally arrested. Wong Sun was later released, but returned several days later and gave a statement which he refused to sign although he admitted the accuracy of its contents. The Court determined that Toy's declarations at the time of the arrest were fruits of the illegal entry and arrest. In holding that the heroin to which his declarations had led the agents was also "fruit of the poisonous tree," the Court set forth the following test at page 487:

Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence "from an independent source," *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States,* 308 U.S. 338, 341. We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire,

Evidence of Guilt, 221 (1959). We think it clear that the narcotics were "come at by the exploitation of that illegality" and hence that they may not be used against Toy.

The Court then faced the question of whether Wong Sun's unsigned confession was "fruit" of his illegal arrest. Based upon evidence that Wong Sun had been released on his own recognizance after a lawful arraignment and had returned voluntarily several days later to make the statement, the Court held that the "connection between the arrest and the statement had become so attenuated as to dissipate the taint," citing *Nardone v. United States,* 308 U.S. 338 (1939).

On the basis of the Court's holding with respect to Toy, petitioner maintains that "all evidence in a chain causally connected to and derived from illegally obtained evidence must be suppressed." Respondent, on the other hand, maintains this case is controlled by the following principle set forth in the Supreme Court's decision in *Nardone v. United States, supra,* and relied upon by the Court in *Wong Sun, supra,* in upholding the admission of Wong Sun's unsigned statement:

Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. [308 U.S. at 341.]

We agree with respondent and hold that the connection between the illegal search and the evidence to be introduced at trial has "become so attenuated as to dissipate the taint."

In reaching our conclusion, we have considered each item of information on the Form 4790 and have examined the use up to the time of the interview of petitioner when more detailed evidence was obtained. For purposes of analysis, the items of information can be broken down primarily into three categories: (1) Items relating to the identity of the taxpayer, such as his name, address, citizenship, and passport number; (2) the source of the $20,000, i.e., Chemical Bank—NY.; and (3) the amount of cash on his person at the time of the search.

First, respecting the items relating to petitioner's identity, we are convinced that it would be stretching the exclusionary rule beyond reasonable bounds to hold in every case in which the identity of an individual is somehow illegally obtained that all information subsequently acquired must be suppressed. In *United States v. Friedland,* 441 F.2d 855 (2d Cir. 1971), the Second

Circuit held that even though the Government is put on notice, through the receipt of illegally obtained information, that a person has been involved in criminal activities and is, therefore, the sort of person who would bear watching, this alone would not immunize him from investigation of different criminal activities and from prosecution on the basis of facts about them learned in a lawful way. A much stronger case for admission exists where, as here, no evidence of *any* crime was uncovered by the illegal airport search. In addition, in the instant case there have been numerous intervening legal acts on the part of respondent's agents which are more than sufficient to break the causal connection between the illegal search and the evidence to be introduced at trial. See *United States v. Fike,* 449 F.2d 191 (5th Cir. 1971).

Second, we must ascertain whether respondent's agents exploited the lead on the Form 4790 relating to the source of the funds, i.e., "Chemical Bank—N.Y." After hearing the testimony of the agents who participated in the tax investigation of petitioner, we are satisfied that no use was made of this particular lead. The agents issued summonses for petitioner's records at Chemical Bank only after the interview of December 11, 1973, based upon petitioner's income tax return and the interview. In *United States v. Schipani,* 414 F.2d 1262 (2d Cir. 1969), the court approved the following legal principle applied by the District Court: "evidence discovered 'as a result of both legal and illegal leads' is inadmissible even though 'the legal lead would itself probably have sufficed to uncover the evidence.' " However, the instant case does not present a situation requiring the application of this principle for we are convinced that the leads which the agents exploited which directed them to petitioner's accounts at Chemical Bank were petitioner's original income tax returns on file with the Internal Revenue Service, not the Form 4790. Had respondent's agents requisitioned petitioner's Chemical Bank records "as a result of" the use of information on the Form 4790, such use would clearly have constituted an exploitation of the primary illegality. The mere fact that the information as to the source of the $20,000 in currency was in the possession of the respondent's agents is not sufficent to cause other evidence to be tainted if the lead was not utilized.

Third, with respect to the amount of cash shown on the Form 4790, the illegal search of December 7, 1972, could not have

picked up leads to the alleged fraudulent understatement of income which did not occur until a future date, i.e., the date he filed his 1972 Federal income tax return. *United States v. Cole,* 325 F.Supp. 763 (S.D.N.Y. 1971), affd. 463 F.2d 163 (2d Cir. 1972). In *United States v. Cole, supra,* the District Court rejected the contention that "a tainted lead to a taxpayer whose conduct is suspect generally as that of a habitual tax evader immunizes him from prosecution for tax evasion committed subsequent to an illegal eavesdrop." A contrary rule would give petitioner a license to violate the Federal income tax laws with impunity. Use of the lead of the amount of cash with respect to the determination for years prior to 1972 could hardly form the basis for suppressing all of respondent's evidence as to those years because the cash was not discovered until December 7, 1972 (the date of the airport search).

The fact situation of the instant case clearly constitutes one of those situations visualized by the Court in *Nardone v. United States, supra,* where "sophisticated argument may prove a causal connection" between the illegal activity and the Government's proof, but where, "as a matter of good sense, * * * such connection [has] become so attenuated as to dissipate the taint." The causal connection is far more attenuated than the one existing between Wong Sun's illegal arrest and his unsigned statement. Accordingly, we hold that none of respondent's evidence is tainted as a result of the airport search.

Finally, our holding that respondent's proof is not tainted by the illegal search rests upon our failure to recognize what policy considerations would be served by suppressing any evidence obtained as a result of the search. The primary purpose of the exclusionary rule is to deter unlawful police conduct and compel respect for the guaranty of the fourth amendment against unreasonable searches and seizures. *United States v. Calandra,* 414 U.S. 338 (1974). It has been held that where there is little deterrent effect in excluding evidence from consideration, there is no benefit in excluding it. *United States v. Schipani,* 435 F.2d 26, 28 (2d Cir. 1970). Due to the fact that airport searches are no longer conducted in the manner described in our findings of fact, we are unable to visualize what deterrent effect the suppression of any evidence in this case will have on the performance of future airport searches.

We now turn to petitioner's contention that his fifth and sixth amendment rights were violated by the alleged failure of respondent's agents to give him the warnings required by (1) *Miranda v. Arizona,* 384 U.S. 436 (1966), and (2) *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969), and *United States v. Leahey,* 434 F.2d 7 (1st Cir. 1970).

Petitioner first maintains that respondent's agents failed to comply with certain procedures published in I.R.S. News Release No. 949 (Nov. 26, 1968), thus violating his right to due process of law under the fifth amendment. In *Heffner* and *Leahey* the courts suppressed evidence obtained by special agents during interviews with taxpayers in which the agents failed to conform with published procedures of the Internal Revenue Service. The decisions were premised on the ground that the failure of the I.R.S. to follow its own established procedures constituted a violation of due process. In I.R.S. News Release No. 949 dated Nov. 26, 1968, the Service announced a revised procedure for advising a taxpayer of his rights during an investigation by a special agent of the Intelligence Division of the Internal Revenue Service. A special agent is now required to identify himself, describe his function, warn the taxpayer that he cannot be compelled to incriminate himself by answering any questions or producing any documents, and advise the taxpayer that he has the right to seek the assistance of an attorney before responding. As indicated in our findings of fact, Special Agent Howard fully complied with the requirements of this procedure. Accordingly, we find that petitioner's rights to due process of law under the fifth amendment were not violated during the interview.

Petitioner relies upon the decision of the Seventh Circuit in *United States v. Oliver,* 505 F.2d 301 (7th Cir. 1974), in support of his contention that his fifth and sixth amendment rights were violated by the failure of respondent's agents to give him the full *Miranda* warnings at the beginning of the interview of December 11, 1973. More specifically, petitioner contends that the special agents failed to advise him of his right to remain silent and his right to have an attorney present with him during the interview. In *United States v. Oliver, supra,* the Seventh Circuit reaffirmed its holding in *United States v. Dickerson,* 413 F.2d 1111 (7th Cir. 1969), that the full *Miranda* warnings must be given at the inception of the first contact with the taxpayer after the case has been transferred to the Intelligence Division. The *Dickerson*

holding has not been followed by any of the Courts of Appeals which have been confronted with the issue of whether the *Miranda* warnings must be given in every instance to targets of criminal tax investigations.[6] In *United States v. Jaskiewicz,* 433 F.2d 415 (3d Cir. 1970), the Third Circuit, the Court of Appeals to which an appeal from our decision herein will lie, held that the affirmative duties imposed upon the Government by *Miranda* "arise not because the defendant has become the focus of the potential indictment but because the government has in some meaningful way imposed restraint on his freedom of action." In conclusion, the court stated at page 420:

In short, the decision in Miranda v. Arizona, 384 U.S. 436, * * * (1966), does not require that this court in this case depart from its pre-*Miranda* rule that the sole test for admissibility of a taxpayer's statements to agents of the Treasury Department is the voluntariness of the statements. United States v. Frank, 245 F.2d 284 [51 AFTR 537] (3 Cir.), cert. denied, 355 U.S. 819, * * * (1957); United States v. Burdick, 214 F.2d 768, 773 [45 AFTR 1823] (3 Cir. 1954), cert. denied, 350 U.S. 831, * * * (1955). [Fn. ref. omitted.]

Under our holding in *Jack E. Golsen,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), we are bound to apply the test utilized by the Third Circuit in determining the admissibility of statements made by petitioner during the course of the interview and leads obtained therefrom. Thus, in order for evidence resulting from the interview to be admissible, petitioner's statements must be found to have been made voluntarily. Based upon the testimony as to the atmosphere of the interview and our findings concerning the warnings given and the preliminary statements made by the special agents, we are satisfied that this test has been satisfied. Accordingly, the motion to suppress, to the extent it relates to statements made during the interview of December 11, 1973, and leads obtained therefrom, must be denied.

Accordingly, we hold that none of respondent's evidence is tainted by the illegal airport search or the interview of petitioner at his residence. None of respondent's evidence will be suppressed

---

[6] *Taglianetti v. United States,* 398 F.2d 558 (1st Cir. 1969); *United States v. White,* 417 F.2d 89 (2d Cir. 1969); *United States v. Jaskiewicz,* 433 F.2d 415 (3d Cir. 1970); *United States v. Bagdasian,* 398 F.2d 971 (4th Cir. 1968); *United States v. Prudden,* 424 F.2d 1021 (5th Cir. 1970); *United States v. Maius,* 378 F.2d 716 (6th Cir. 1967); *Muse v. United States,* 405 F.2d 40 (8th Cir. 1968); *United States v. Chikata,* 427 F.2d 385 (9th Cir. 1970); *Hensley v. United States,* 406 F.2d 481 (10th Cir. 1968).

and no constitutional grounds exist for shifting the burden of going forward with the evidence to respondent.

*An appropriate order will be entered.*